# Exhibit A

2020 WL 1638329
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

BART STREET III, a Nebraska
Limited Liability Company, Plaintiff,

v.

ACC ENTERPRISES, LLC, a Nevada Limited
Liability Company; ACC Industries, Inc., a
Nevada Corporation; Calvada Partners, LLC, a
Nevada Limited Liability Company, Defendants.

Case No. 2:17-cv-00083-GMN-VCF
|
Signed 03/31/2020
|
Filed 04/01/2020

**Attorneys and Law Firms**

Matthew C. Wolf, Daniel R. McNutt, McNutt Law Firm, P.C.,
Las Vegas, NV, for Plaintiff.

Daniel S. Cereghino, Brenoch R. Wirthlin, Fennemore Craig
Jones Vargas Kevin J. Hejmanowski, Anderson, McPharlin
& Conners LLP, Thomas H. Fell, Fennemore Craig, P.C.,
Las Vegas, NV, for Defendants ACC Enterprises, LLC, ACC
Industries, Inc.

Daniel S. Cereghino, Brenoch R. Wirthlin, Fennemore Craig
Jones Vargas, Kevin J. Hejmanowski, Anderson, McPharlin
& Conners LLP, Mark Hawkins, Thomas H. Fell, Fennemore
Craig, P.C., Las Vegas, NV, for Defendant Calvada Partners,
LLC.

## ORDER

Gloria M. Navarro, District Judge

**\*1** Pending before the Court is Plaintiff Bart Street
III, LLC's ("Plaintiff's") Motion for Summary Judgment,
(ECF No. 180). Defendants ACC Enterprises, LLC, ACC
Industries, Inc., and Calvada Partners, LLC (collectively,
"Defendants") filed a Response, (ECF No. 191), and Plaintiff
filed a Reply, (ECF No. 196).

Also pending before the Court is Defendants' Motion
for Summary Judgment, (ECF No. 185). Plaintiff filed a

Response, (ECF No. 190), and Defendants filed a Reply,
(ECF No. 197).

Also pending before the Court is Defendants' Objection,
(ECF No. 198), to United States Magistrate Judge Cam
Ferenbach's Order, (ECF No. 193), granting Plaintiff's
Motions to Establish Protocols for Searching Texts, (ECF
No. 173), and to Compel, (ECF No. 178). Plaintiff filed a
Response, (ECF No. 199).

For the reasons discussed below, the Court **DENIES**
Plaintiff's Motion for Summary Judgment. The Court
**GRANTS in part** and **DENIES in part** Defendants' Motion
for Summary Judgment. The Court **DENIES** Defendants'
Objection.

## I. BACKGROUND

This case arises from Defendants' alleged breach of a
multi-million-dollar loan contract (the "Contract" or the
"Agreement") that Defendants entered with Plaintiff to
finance the expansion of Defendants' marijuana cultivation
business. Plaintiff Bart Street III, LLC was formed for the
purpose of providing a loan to Defendants' business. (*See*
Sean Mullen [1] Dep. 21:1–23:5, Ex. 7 to Pl.'s MSJ, ECF No.
183-2). Defendants own and operate a marijuana cultivation
plant in Pahrump, Nevada, which is currently licensed by
the state to grow medical and recreational marijuana. (*See*
Howard Misle [2] ("Misle") Decl. ¶¶ 3–4, Ex. 1 to Defs.'
MSJ, ECF No. 185-1). At the time the parties entered the
Agreement, Defendants' had a license to cultivate marijuana
for medical use, but Nevada had not yet legalized recreational
marijuana at the state level. (*See id.* ¶ 9). Anticipating that
the state would sanction recreational marijuana, Defendants
sought outside funding to expand their operation. (*Id.*) To
that end, the parties reached an agreement for Plaintiff to
loan Defendants $4.7 million through two promissory notes
(collectively, the "Notes"). (*See* Misle Dep. 64:24–71:1,
82:20–86:6, Ex. 5 to Pl.'s MSJ, ECF No. 181-5); (First
Promissory Note ("First Note"), Ex. 10 to Pl.'s MSJ, ECF No.
183-5); (Second Promissory Note ("Second Note"), Ex. 11 to
Pl.'s MSJ, ECF No. 183-6).

The parties executed the First Note on August 19, 2016. (*See*
First Note). The Note provided Defendants a $3.5 million
loan at an interest rate of seven percent (7%) per year.
(*Id.*). The terms of the First Note earmarked Defendants'
uses of the loan funds as follows: $25,000.00 to Plaintiff
for due diligence costs, $750,000.00 to Defendants for

operating capital, $2,200,000.00 to Beverly Pacific, LLC ("BP"), $275,000.00 to Insight Medical, LLC ("Insight"), and $275,000.00 to Hill Health, LLC ("HH"). (*Id.*) BP, Insight, and HH had previously extended loans to Defendants that would soon become due. (*See* HH and Insight Loan Agreement, Ex. 8 to Pl.'s MSJ, ECF No. 183-3); (BP Convertible Promissory Note, Ex. 9 to Pl.'s MSJ, ECF No. 183-4); (Misle Dep. 39:12–25, 99:8–102:20, 114:18–115:12, ECF Nos. 181-5, 182–1). The First Note also included a right of first refusal term stating, "During the period of time that there is any outstanding principal or interest due under this Note, at the option of the Holder, the Holder shall have a First Right of Refusal to participate and obtain fully paid and non-assessable Units or Shares of either or both ACC Industries, Inc. and ACC Enterprises, LLC." (First Note ¶ 12).

**\*2** The parties executed the Second Note on September 6, 2016, which provided Defendants $1.2 million at an interest rate of three percent (3%) per year (*See* Second Note). The Second Note's earmarks directed Defendants to purchase two parcels of land; the Note provided $500,000.00 to acquire the parcel located at 1241 E. Calvada Boulevard, Pahrump, Nye County, Nevada and $700,000.00 for the nearby 1261 E. Calvada Boulevard. (*See id.*). The Second Note included a right of first refusal provision identical to that of the First Note. (*See id.* ¶ 12).

Defendants did not repay the BP loan as the First Note required. (Misle Dep. 82:12–16, 116:17–20). Instead, on October 24, 2016, BP converted its loan to equity on behalf of its successor-in-interest, Vert Holdings, LLC ("Vert"), but Defendants retained the $2.2 million allocated to paying BP in the First Note. (Vert Membership Purchase Agreement § 1.4, Ex. 16 to Pl.'s MSJ, ECF No. 184-5); (Misle Dep. 123:6–124:24). Defendants have not repaid any principal or interest owed under the Notes. (*See* Misle Dep. 68:9–14, 93:18–19, 253:13–15); (Peter Seltzer [3] Dep. 56:19–22, Ex. 6 to Pl.'s MSJ, ECF No. 182-2). Plaintiff commenced this action for breach of contract and unjust enrichment by filing the Complaint on January 10, 2017. (*See* Compl., ECF No. 1).

On October 26, 2017, Defendants moved to dismiss the Complaint, primarily arguing that they cannot be liable for breach of a contract that is illegal under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA"). (*See* Renewed Mot. Dismiss ("MTD"), ECF No. 155) In its Order, the Court found that Nevada does not take such a black-and-white approach to the enforceability of illegal contracts. (MTD Order 8:19–22, ECF No. 155). Rather, the Court asked

whether the illegal provisions of the contract are severable. (*Id.* 8:19–22, 9:6–17). It noted that a provision is severable if it is collateral to the parties' intent in entering the contract. (*Id.* 8:22–9:5). If the illegal provisions are severable, then the Court may enforce the lawful terms of the Contract. (*Id.*) The Court found that the right of first refusal and operating capital terms violated the CSA. (*Id.* 10:5–23). Both were unenforceable because the right of first refusal term would have allowed Plaintiff to profit from the sale of marijuana, and the operating capital provision provided direct assistance to Defendants' cultivation of marijuana. (*Id.*) Nevertheless, the Court concluded that it did not have the evidence to assess the Contract's severability at the motion to dismiss stage. (*Id.* 10:24–11:8). It explained, "[w]hether severance should apply in this case, however, is a question to be decided through evidence that such action would be in line with the parties' intent in contracting and that the unenforceable provisions are collateral to the overall agreement—evidence the Court does not have at this stage of the case." (*Id.*)

Now at summary judgment, the parties dispute their intent in entering the Contract. Plaintiff contends that the Contract was primarily a loan, and the right of first refusal term was collateral to the parties' intent in entering the Contract. (*See* Pl.'s MSJ, Statement of Facts ¶¶ 7–8, 14). In contrast, Defendants argue that the Notes were part of a larger $9 million agreement (the "Modification Agreement") for Plaintiff to obtain an equity stake in Defendants' marijuana business, which demonstrates the centrality of Plaintiff's intent to profit from Defendants' sale of marijuana. (Defs.' MSJ, Statement of Facts ¶¶ 27–40, 43, 47). Even if the parties never executed the Modification Agreement, Defendants argue that the right of first refusal term is not severable because Plaintiff primarily intended upon having a pathway to obtain equity in Defendants' business. (*See id.* ¶¶ 42, 45–46). Accordingly, both parties now move for summary judgment. (*See* MSJs, ECF Nos. 180, 185).

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

**\*3** The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. 2548. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge

to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50, 106 S.Ct. 2505.

**B. Objections to a Magistrate Judge's Order**

**\*4** When reviewing the order of a magistrate judge, the order should only be set aside if the order is clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a); LR IB 3-1(a); 28 U.S.C. § 636(b)(1)(A); *Laxalt v. McClatchy*, 602 F. Supp. 214, 216 (D. Nev. 1985). A magistrate judge's order is "clearly erroneous" if the court has "a definite and firm conviction that a mistake has been committed." *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Burdick v. Comm'r IRS*, 979 F.2d 1369, 1370 (9th Cir. 1992). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *UnitedHealth Grp., Inc. v. United Healthcare, Inc.*, No. 2:14-cv-00224-RCJ, 2014 U.S. Dist. LEXIS 129489, 2014 WL 4635882, at *1 (D. Nev. Sept. 16, 2014). When reviewing the order, however, the magistrate judge "is afforded broad discretion, which will be overruled only if abused." *Columbia Pictures, Inc. v. Bunnell*, 245 F.R.D. 443, 446 (C.D. Cal. 2007). The district judge "may not simply substitute its judgment" for that of the magistrate judge. *Grimes v. City and County of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991) (citing *United States v. BNS, Inc.*, 858 F.2d 456, 464 (9th Cir. 1988)).

## III. DISCUSSION

Plaintiff argues that it should receive summary judgment on its breach of contract claim because the illegal terms of the Contract are severable; or, in the alternative, Plaintiff contends it should recover for Defendants' unjust enrichment. (Pl.'s MSJ 18:12–28:7, ECF No. 180). Defendants ask the Court to hold that they are liable under neither theory because of the Contract's illegality. (Defs.' MSJ 14:20–26:16, ECF No. 185). The Court begins its analysis with breach of contract.

### A. Breach of Contract

Plaintiff argues that the Contract with Defendants is valid and enforceable because the Court can sever the right of first refusal and operating capital terms. (Pl.'s MSJ 18:12–25:28). Defendants argue that the Contract is unenforceable because: (1) it violates federal law; (2) the illegal provisions cannot be severed; and (3) Plaintiff engaged in the first breach of the Contract. (Defs.' MSJ 14:12–25:17). The Court addresses Defendants' first-to-breach defense before turning to the Contract's legality.

### 1. First Breach

The Court first addresses Defendants' argument that Plaintiff is precluded from seeking recovery under the so-called "first breach doctrine" because, if Defendants are correct, the Court need not analyze Plaintiff's breach of contract claim further. The Court concludes the defense is inapplicable because Defendants engaged in the first breach of the Contract.

Nevada law provides, "the party who commits the first breach of the contract cannot maintain an action against the other for a subsequent failure to perform." *Bradley v. Nev.-Cal.-Or. Ry.*, 42 Nev. 411, 178 P. 906, 908 (Nev. 1919). If the first breach of the contract is material, it may excuse the other party's non-performance of its obligations. *See Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526 (9th Cir. 2011).

Defendants argue that Plaintiff breached the Contract in two ways prior to Defendants' alleged breach, which bars Plaintiff's recovery. (*See* Defs.' MSJ 23:16–24:19). Defendants premise the first alleged breach upon a purported modification to the Notes. Specifically, Defendants argue that the parties modified their $4.3 million agreement into a larger $9 million financing arrangement under which Plaintiff would provide Defendants with a $3 million loan and an additional $6 million equity investment. (*Id.* 7:7–13:8, 23:16–26, 24:14–19). Defendants argue that Plaintiff breached the agreement by failing to remit the remaining $4.7 million owed to Defendants. (*Id.*). Alternatively, Defendants argue that even if the Contract was not modified, Plaintiff breached the agreement by initiating this lawsuit before the maturity date of the Notes. (*Id.* 23:27–24:13). Regarding the first allegation, Plaintiff responds that the parties never completed a modification compliant with the statute of frauds. (Pl.'s Resp. 20:2–4); (Pl.'s MSJ 13:1–17:27). Plaintiff also argues it did not breach the Notes because, even though it commenced this action before the maturity date, Defendants preliminarily breached the Contract by failing to repay BP pursuant to the First Note and instead letting BP convert its note to equity. (Pl.'s Resp. 19:4–20:12).

**\*5** The Court concludes that the first breach defense is inapplicable. Defendants cannot successfully assert that Plaintiff breached a $9,000,000.00 modification agreement because Defendants' purported modification is barred by the statute of frauds. Nevada's statute of frauds explains that certain agreements are void "unless the agreement, or some note or memorandum thereof expressing the consideration, is in writing, and subscribed by the person charged therewith." NRS § 111.220. Loans of over $100,000 "made by a person engaged in the business of lending money" and modifications thereof are subject to the statute of frauds. NRS § 111.220(4); *see, e.g., Hampton v. Countrywide Home Loans Inc.*, No. 2:10-cv-01775-RLH-GWF, 2011 U.S. Dist. LEXIS 53715, 2011 WL 1792743, at *2 (D. Nev. May 11, 2011). The Promissory Notes' text indicates that Plaintiff extended a $4.7 million loan to Defendants. (*See* Promissory Notes, Exs. 10–11 to Pl.'s. MSJ, ECF No. 183-5–183-6). Plaintiff is in the business of lending money; it was formed for the express purpose of lending money to Defendants. (Mullen Dep. 23:2–5, Ex. 7 to Pl.'s MSJ, ECF No. 183-2). Therefore, for a modification to be enforceable, it must have been reduced to a writing signed by Plaintiff. However, Defendants argue that the agreement was reduced to a writing and accepted by silence. (Defs.' MSJ 9:18–10:11)

Defendants highlight evidence indicating that the parties negotiated to reach a $9 million Modification Agreement, which, at best, shows that the parties intended to execute the modification. (*See* Misle Decl. ¶¶ 23, 28, Ex. A to March 14, 2017 Resp. to Pl.'s MSJ, ECF No. 35) (noting that the parties orally modified the Notes); (Defs.' MSJ ¶¶ 31–40) (describing negotiations over a modification that were never reduced to a signed writing containing that material terms of

the modification). Defendants argue that Plaintiff accepted the Modification Agreement's terms by silence after Defendants sent Plaintiff an email articulating the terms and Plaintiff subsequently failed to respond. (Defs.' MSJ 9:18–10:11); (*see* Calvada Partners' Answers to RFA No. 22, Ex. 29 to Pl.'s MSJ 12:9–10, ECF No. 184-18). While the evidence could indicate that the parties intended to agree to the alleged modification, the modification was never reduced to a signed writing, and its enforcement is therefore barred by the statute of frauds. *See Nehls v. William Stock Farming Co.*, 43 Nev. 253, 184 P. 212, 214 (Nev. 1919) (acknowledging acceptance by silence as an exception to the statute of frauds only under a theory of promissory estoppel). Accordingly, there was no legally operative modification.

The Court concludes that Plaintiff did not engage in the first breach of the Contract by initiating this lawsuit. The First Note instructs Defendants to repay BP. (*See* First Note). Instead of taking payment on its note, BP converted its note to equity, and the conversion caused Defendants to breach the First Note. (BP Convertible Promissory Note, Ex. 9 to Pl.'s MSJ, ECF No. 183-4). Therefore, even though Plaintiff commenced this action before the maturity date, Defendants' alleged breach is not excused by the first-to-breach defense.

The Court next discusses Defendants' argument that the Contract is unenforceable because it is illegal. The Court first addresses Defendants' renewed argument that the entirety of the Contract is illegal before turning to severability.

### 2. Illegality

Despite the previous Order holding the contrary, Defendants again press that the entire Contract is illegal under the CSA. (Defs.' MSJ 14:20–23:15). In the previous Order, the inquiry for the Court was whether it could grant Plaintiff's relief under Nevada substantive law in a manner that did not conflict with federal law. (*See id.* 9:18–10:4); *see also Ginsburg v. ICC Holdings, LLC*, No. 3:16-cv-2311-D, 2017 U.S. Dist. LEXIS 187391, 2017 WL 5467688, at *9 (N.D. Tex. Nov. 13, 2017) (explaining that promissory notes financing a marijuana business are not automatically void because "federal courts do not take such a 'black-and-white' approach to enforceability."); *Mann. v.* Gullickson, No. 15-cv-03630-MEJ, 2016 U.S. Dist. LEXIS 152125, 2016 WL 6473215, at *7 (N.D. Cal. 2016) (explaining that payment for the purchase of a marijuana business "does not require [defendant] to possess, cultivate, or distribute marijuana....

[t]hus, unlike *Bassidji*, ordering payment on the parties' contract would not mandate illegal conduct.") Concluding that such a remedy is possible, the Court explained that the entire agreement is not automatically unenforceable because, "Nevada law allows courts to sever the illegal portions from those that are legal, and then enforce the legal portions." (MTD Order, 8:20–21, ECF No. 155). The Court clarified that if the illegal provisions—the right of first refusal and operating capital terms—are severable, the Court can fashion relief because the provisions lending money to repay existing debts and purchase land are lawful. (*Id.*). Given that the Court's previous holding is the law of the case, the Court declines to disturb it. *See Christianson v. Colt Indus. Operating Corp.* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). The Court now addresses the dispositive issue to Plaintiff's breach of contract claim: severability.

### 3. Severability

**\*6** The parties dispute whether the illegal portions of the contract, the right of first refusal and operating capital terms, are severable from the otherwise lawful provisions. (*See* Pl.'s MSJ 24:10–25:24); (Defs.' MSJ 24:20–25:17). The Court finds that it cannot determine severability at summary judgment. Although severability is an issue of law for the Court to decide, there is an underlying dispute of fact regarding whether the right of first refusal was collateral to the parties' primary purpose in entering the Contract.

While illegal contracts are generally unenforceable under Nevada law, a contract containing illegal provisions is enforceable if the illegal terms are severable. *See Vincent v. Santa Cruz*, 98 Nev. 338, 647 P.2d 379, 381 (Nev. 1982). Contract terms are severable if they are "collateral to the main transaction." *Id.* A term is collateral if the court could strike the provision and enforcement would preserve the parties' intent in making the agreement. *See id.*; *see also Sprouse v. Wentz*, 105 Nev. 597, 781 P.2d 1136, 1140–41 (Nev. 1989). Whether terms are severable is a question of law to be decided by the court. *Sprouse*, 781 P.2d at 1140. The court determines severability first by looking to the terms and subject-matter of the contract. *Id.* If the parties' intent remains unclear, then the court turns to testimony surrounding the making of the contract. *See id.*; *see also Serpa v. Darling*, 107 Nev. 299, 810 P.2d 778, 782 (Nev. 1991) (Rose, J., dissenting).

In the previous Order, the Court held that the right of first refusal and operating capital provisions of the Contract

are illegal because they "permit[ ] Defendants to directly use Plaintiff's funds for cannabis cultivation or to gain ownership in Defendant's cannabis business." (MTD Order 10:5–10:23). The Court, however, left its determination of severability for a later date. (*Id.* 7:3–12:9). The Order explained, "[w]hether severance should apply in this case ... is a question to be decided through evidence that such action would be in line with the parties' intent in contracting and that the unenforceable provisions are collateral to the overall agreement—evidence the Court does not have at this stage in the case." (*Id.* 11:2–5).

Now, at summary judgment, the Court assesses the evidence of the parties' intent. [4] If the parties' primarily intended the loan to provide Plaintiff a path to obtain an ownership interest in Defendants' marijuana business, then the entire Contract is unenforceable. However, if the parties primarily intended to execute a loan agreement for which the right of first refusal and operating capital provisions were not essential to the parties' intent in entering the agreement, then the provisions are severable and do not defeat enforcement. (*See id.* 8:19– 10:4, 10:24–12:9).

**\*7** Plaintiff argues that the Court should sever any unlawful provisions of the Contract because they are collateral to the parties' primary purpose: "enabl[ing] Defendants to purchase the Real Property and repay [HH, Insight,] and BP." (Pl.'s MSJ 25:1–3); (*see also* Pl.'s Resp. to Defs.' MSJ, 20:13– 21:7). Plaintiff explains that unlike the earmarks, the right of first refusal was never assigned any value on the face of the Promissory Notes, and it is therefore severable because its value is *de minimis.* (*Id.* 25:7–10). Plaintiff also argues that the term is severable because Plaintiff has the right to waive the provision as its beneficiary. (  *Id.*) Defendants counter that, "[p]laintiff's single overriding intent was to provide financial assistance to and, in turn, derive financial benefit from (including an ownership interest in) Defendants' marijuana cultivation business." (Defs.' Resp. to Pl.'s MSJ 5:18–20); (*see also* Defs.' MSJ 20:6–24) (explaining that providing Plaintiff a right of first refusal as a pathway to invest in and profit from Defendants' business is part of the Contract's primary purpose). Therefore, they argue the Contract is unenforceable in its entirety. (*Id.* 5:20–7:5).

Looking first to the text and subject-matter of the Promissory Notes, the Court finds that the parties' intent is ambiguous. Several of the requirements of the Promissory Notes evidence the intent to enter lawful transactions. (*See* First Promissory Note, Ex. 10 to Pl.'s MSJ, ECF No. 183-5) (earmarking

funds for due diligence costs and payment to prior lenders); (Second Promissory Note, Ex. 11 to Pl.'s MSJ, ECF No. 183-6) (earmarking funds to acquire two parcels of land); (*see also* Order 9:18–10:4) (explaining that those provisions mandate only lawful conduct). Nevertheless, both Notes provide Plaintiff a right of first refusal to acquire units or shares in Defendants' business if any are offered while any principal or interest remains owing on the Notes. (*See* First Note ¶ 12); (Second Note ¶ 12). The right of first refusal is not earmarked for specific consideration, but the Court is unconvinced that it can draw any conclusions about the parties' intent from the omission. The Notes' terms do not resolve whether providing Plaintiff a potential pathway to ownership was essential to Plaintiff's intent, or if the right of first refusal was collateral to Plaintiff's intent to issue Defendants a loan.

The parties' extrinsic evidence does little to resolve the parties' intent. Plaintiff primarily rests its argument that the term is severable on the Notes' non-assignment of specific consideration for the right of first refusal. (*See* Pl.'s MSJ 25:1–24). Plaintiff also argues that the parties primarily intended to create a loan agreement "because Defendants were facing critical deadlines to purchase the Real Property and repay HH[ ], [Insight,] and BP." (*Id.* 24:23–27); (citing Mullen Email, Oct. 4, 2016, Ex. 12 to Pl.'s MSJ, ECF No. 184-2) ("We advanced these monies almost a month ago because you told us that you were against a critical time issue on both the real estate and the BP note."); (Seltzer Dep. 190:14–22, Ex. 6 to Pl.'s MSJ, ECF No. 183-1) (explaining that Plaintiff made the loan at a "critical time" to pay prior debts and acquire the real property); (Mullen Dep. 106:3–23, Ex. 7 to Pl.'s MSJ, ECF No. 183-2) (explaining that despite knowing Defendants' business was federally illegal, Plaintiff advanced the loan to help them pay prior debts); (Mullen Dep. 122:10–17) (explaining that Defendants wanted to borrow money from Plaintiff "to pay out BP."). Defendants contend that Plaintiff primarily extended the loan to obtain a path to an equity investment in Defendants' business through the right of first refusal. (Defs.' MSJ 25:13–27); (Misle Decl. ¶ 16, Ex. 1 to Defs.' MSJ, ECF No. 186-1) (explaining that Plaintiff, when attempting to exercise its right of first refusal, stated, "I don't give a damn what you guys keep doing with BP in the deal as long as we're not diluted and it comes from your end only); (Idleman Dep. 103:17–25, Ex. 4 to Defs.' MSJ, ECF No. 186-1) (admitting he stated "I don't really give an mmmm about BP ... just as long as they don't impact our rights under this right of first refusal in our loan, just as long as they don't dilute any future equity we may pick up); (Defs.'

Resp. to Pl.'s MSJ 7:25–4); (citing Idelman Dep. 166:2–16, 202:11–13, 253:11–20, Ex. C to Defs.' Resp., ECF No. 191-1) (explaining that Plaintiff had interest in an equity deal with Defendants when it first executed the Notes, but Plaintiff later lost interest because Defendants allowed BP to convert its note to equity, and Plaintiff thought an investment would be risky after the 2016 election).

**\*8** It bares mentioning that the severability inquiry requires the Court to ask if enforcement of the Contract after severing the illegal terms would effectuate the parties' intent *at the time the Contract was entered. See Vincent,* 647 P.2d at 381; *Sprouse,* 781 P.2d at 1140–41. If the Court finds that Plaintiff would not have offered Defendants a loan without receiving a right of first refusal as consideration, then the right of first refusal is not collateral to the parties' intent in entering the transaction, and the entire Contract is unenforceable. Plaintiff's present lack of interest in exercising its right of first refusal is irrelevant.

There remains a dispute of fact that the Court cannot decide at summary judgment. Plaintiff's extrinsic evidence demonstrates that Defendants sought the loan to purchase real estate and repay existing lenders, but the evidence does not speak to whether Plaintiff would have made the loan without receiving a right of first refusal. Defendants' evidence suggests that Plaintiff placed considerable value on its right of first refusal, but the evidence does not establish whether the provision was essential to the consummation of the agreement. Given the dispute of material fact, the Court leaves its severability determination for trial.

## B. Unjust Enrichment

Plaintiff argues that if it does not prevail on its breach of contract claim, it should recover under its unjust enrichment theory. (*See* Pl.'s MSJ, 26:1–27:25). Given that the Court would only reach Plaintiff's alternative unjust enrichment claim if the Court were to determine the Contract is illegal and incapable of severance, the Court concludes that Plaintiff's unclean hands would bar its recovery for unjust enrichment.

Under Nevada law, unjust enrichment claims have the following three elements: "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) an acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *Takiguchi v. MRI Int'l, Inc.,* 47 F. Supp. 3d 1100, 1119 (D. Nev. 2014) (citing *Unionamerica*

*Mortg. & Equity Trust v. McDonald,* 97 Nev. 210, 626 P.2d 1272, 1273 (Nev. 1981)). However, unjust enrichment arises in equity, and "[t]he unclean hands doctrine generally bars a party from receiving equitable relief because of that party's own inequitable conduct." *See Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc.,* 124 Nev. 272, 182 P.3d 764, 766 (Nev. 2008) (internal quotations omitted) (quoting *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.,* 202 F.3d 223, 228 (4th Cir. 2000)).

Generally, a party cannot recover for unjust enrichment based upon an illegal agreement because "[n]o court should be required to serve as paymaster of the wages of a crime." *Loomis v. Lange Fin. Corp.,* 109 Nev. 1121, 865 P.2d 1161, 1165 (Nev. 1993) (internal quotations omitted) (quoting *Stone v. Freeman,* 298 N.Y. 268, 82 N.E.2d 571, 572 (N.Y. 1948)). The prohibition on enforcement exists "for the purposes of protecting the public and the courts from imposition." *Magill v. Lewis,* 74 Nev. 381, 333 P.2d 717, 719 (Nev. 1958) (quoting *Norwood v. Judd,* 93 Cal.App.2d 276, 209 P.2d 24 (Cal. Ct. App. 1949)). However, a narrow exception arises when, "by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff ..." *Id. See also Loomis,* 865 P.2d at 1165 (explaining that the *Magill* exception applies when the plaintiff otherwise "substantially complied with the [law].") (quoting *Nev. Equities v. Willard Peake Drilling,* 84 Nev. 300, 440 P.2d 122, 123 (Nev. 1968)). Nevertheless, the application of an unclean hands defense is particularly compelling when a plaintiff seeks a remedy that violates criminal law. *Omstead v. United States,* 277 U.S. 438, 484–85, 48 S.Ct. 564, 72 L.Ed. 944 (1945) (rev'd on other grounds) (Brandeis, J., dissenting). "[T]he court's aid is denied ... when he who seeks it has violated the law in connection with the very transaction to which he seeks legal redress ... in order to maintain respect for law...." *Id.*

**\*9** Plaintiff cannot prevail for unjust enrichment because the parties' Contract involves moral turpitude.[5] If the Contract is unenforceable, it is because Plaintiff invested in Defendants' marijuana cultivation business primarily to obtain a pathway to an equity investment therein. *See* § (A)(3), *supra.* Providing funds in exchange for equity violates the CSA because

it would allow the investor to profit from the cultivation, possession, and sale of marijuana. (MTD Order 10:13–23);

21 U.S.C. §§ 841, 846, 856(a)(2). Conspiracy to cultivate marijuana is a crime of moral turpitude. *See, e.g., Collymore v. Lynch*, 828 F.3d 139, 142–46 (2d Cir. 2016); *Desai v. Mukasey*, 520 F.3d 762, 764–66 (7th Cir. 2008); *In re Sanchez Gomez*, 115 D.P.R. 74, 75 (P.R. 1984); *People v. Gabriel*, 206 Cal. App. 4th 450, 459, 141 Cal.Rptr.3d 784 (Cal. Ct. App. 2012).

Plaintiff argues that the Court should allow its recovery for unjust enrichment because, "[t]he transaction has been completed, Bart Street has never grown or sold marijuana, Defendants are the only parties involved with marijuana, marijuana is legal in Nevada, and allowing Defendants to keep the $4.7M would unjustly enrich Defendants at Bart Street's expense." (Pl.'s MSJ 27:15–18). It is irrelevant that the Nevada legislature "legalized" marijuana because marijuana is illegal under federal law, and the CSA preempts Nevada law under the Constitution's Supremacy Clause.

*United States v. Nixon*, 839 F.3d 885, 888 (9th Cir. 2016). In determining whether moral turpitude is involved in the transaction, it is not the job of the Court to weigh the policy considerations behind federal marijuana prohibition against Nevada law and the growing trend of state "legalization." Rather, "it is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 1 Cranch 137, 177, 2 L.Ed. 60 (1803). Allowing Plaintiff's recovery for unjust enrichment would undermine enforcement of federal law by giving prospective investors increased confidence in funding marijuana businesses. The Court may not provide Plaintiff an equitable remedy that would allow Plaintiff to circumvent federal criminal law in order to recover the proceeds of its crime. The Court therefore grants Defendants summary judgment on Plaintiff's unjust enrichment claim.

**C. Discovery Objection**

On May 5, 2019, United States Magistrate Judge Cam Ferenbach entered the Order, (ECF No. 193), granting Plaintiff's Motion to Establish Protocols for Searching Texts, (ECF No. 173), and Counter-Motion to Compel ("Counter-Motion"), (ECF No. 178), and Denying Defendants' Motion to Quash, (ECF No. 175). Defendants object to the portions of the Order granting the Counter-Motion and denying the Motion to Quash. (Obj. 1:25–28, ECF No. 198). The Court finds no reason to depart from Judge Ferenbach's Order.

The competing motions concern a subpoena Plaintiff served just before the close of discovery (the "Subpoena"). Defendants argue that its Motion to Quash should have been granted because: (1) the Subpoena violated the Scheduling Order because it was filed on the last day of discovery; and, even if timely filed, (2) the Subpoena must be denied under Fed. R. Civ. P. 34 and LR 26-7 because it was not preceded by a "meet and confer." (*Id.* 1:28–2:11, 2:22–3:8, 4:20–6:27, 10:1–28). Alternatively, Defendants argue that, (3) the Subpoena should be denied as overbroad because it seeks information protected by the attorney-client privilege and work product doctrine. (*Id.* 7:1–9:26).

**\*10** The Court finds the Objection lacking. Plaintiff's Subpoena was timely because, while magistrate judges may in their discretion require a subpoena seeking documents be filed thirty days before the close of discovery so that compliance may be completed before the scheduling order's discovery deadline, it is not an abuse of discretion to allow a subpoena to be served at a later time within the discovery period. *Cf. Fabery v. Mid-South Ob-GYN, PLLC*, No. 06-2136 D/P, 2008 U.S. Dist. Lexis 39679, 2000 WL 35641544, at \*1 (W.D. Tenn. May 15, 2008) ("A subpoena that seeks documents under Federal Rule of Civil Procedure 45 is a discovery device subject to the same deadlines as other forms of discovery set forth in the court's scheduling order."). Judge Ferenbach appropriately acted within his discretion because Plaintiff "first learned about the documents during the last week of discovery at Seltzer's deposition. Due to the timing of that deposition, it would not have been possible for Bart Street to request the documents 30 days before the discovery deadline." (Pl.'s Resp. to Defs.' Obj., 6:27–7:1, ECF No. 199). Likewise, while subpoenas generally should be preceded by a meet and confer, it is not an abuse of discretion for a magistrate judge to enforce a subpoena that is served without a preceding meet and confer. *See LHF Prods., Inc. v. Koehly*, No. 2:16-cv-02028-JAD-NJK, 2017 U.S. Dist. LEXIS 173834, 2017 WL 4767673, at \*4 (D. Nev. Oct. 19, 2017) ("These cases make clear that, notwithstanding the language of the local rule, 'the court ultimately retains discretion to decide discovery motions even where no proper meet and confer has been conducted.' ") (quoting *Mielke v. Standard Metals Processing, Inc.*, No. 2:14-cv-01763-JCM-NJK, 2015 U.S. Dist. LEXIS 60000, 2015 WL 2152664, at \*1 (D. Nev. May 7, 2015)).

Finally, the Court concludes that Judge Ferenbach appropriately limited the risk that enforcement of

the Subpoena would reveal privileged or confidential information. Judge Ferenbach Ordered Defendants to provide a privilege log to the extent any information sought is confidential. (*See* Order, ECF No. 193). Not only do Defendants fail to argue that the safeguard is inadequate, they do not acknowledge the protection in their Objection. For the aforementioned reasons, Defendants have not demonstrated that Judge Ferenbach's Order was clearly erroneous, and their Objection is denied.

## IV. CONCLUSION

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment, (ECF No. 180), is **DENIED**.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment, (ECF No. 185), is **GRANTED in part**

and **DENIED in part**. The Court grants Defendants' Motion with respect to Plaintiff's unjust enrichment claim. The Court denies the Motion on Plaintiff's breach of contract claim.

IT IS FURTHER ORDERED that Defendants' Objection, (ECF No. 198), is **DENIED**.

IT IS FURTHER ORDERED that the parties shall file their proposed joint pretrial order by June 1, 2020.

IT IS FURTHER ORDERED that pursuant to Local Rule 16-5, this case is **REFERRED** to Magistrate Judge Ferenbach for a settlement conference.

**All Citations**

Slip Copy, 2020 WL 1638329

## Footnotes

1    Sean Mullen is the business partner of Steve Idelman ("Idelman"), the principal of Plaintiff Bart Street III, LLC. (*See* Misle Decl. ¶¶ 5, 11, Ex. 1 to Defs.'s MSJ, ECF No. 185-1).

2    Howard Misle is a managing member of Defendant ACC Enterprises, LLC and a director of Defendant ACC Industries, Inc. (Misle Decl. ¶ 1).

3    Peter Seltzer is a Rule 30(b)(6) representative for all Defendants. (Seltzer Dep. 1:14–15).

4    As an initial matter, the Court limits its severability analysis to the right of first refusal term, not the operating capital term. It is Defendants' burden to establish the defense of illegality. *See* 📄 *Schwartz v. Schwartz,* 95 Nev. 202, 591 P.2d 1137, 1140 n.2 (Nev. 1979) (noting that a defendant bears the burden to prove an affirmative defense). Defendants do not present any evidence that enforcing the operating capital provision is essential to the parties' intent. Rather, Defendants argue that Plaintiff allowed them to use more of the loan for operating capital than the First Note earmarks, indicating that Plaintiff cannot recover the additional allowance. (Defs.' MSJ 22:25–23:5); (Defs.' Resp. to Pl. MSJ 7:9–8:4). The argument only implicates Plaintiff's potential remedy, not the term's severability. Defendants also argue that Plaintiff's allowance indicates that the earmarks in the Notes are nominal and unenforceable. (*See* Defs.' Resp. to Pl.'s MSJ 7:6–8:26). The Court finds the argument foreclosed by the statute of frauds. *See supra* § (A)(1). Thus, Defendants have not argued that the operating capital term is inseverable.

5    The Court's conclusion presupposes that the parties' Contract is illegal. If the Court concludes that the parties' Contract was legal, then Plaintiff will recover for breach of contract. Given that Plaintiff only raises its unjust enrichment claim in the alternative, recovery for breach of contract would moot Plaintiff's unjust enrichment theory.

# Exhibit B

KeyCite Yellow Flag - Negative Treatment
Distinguished by Ricatto v. M3 Innovations Unlimited, Inc., S.D.N.Y.,
December 6, 2019

2016 WL 6473215
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Dharminder Mann, Plaintiff,

v.

Sara Gullickson, Defendant.
And Cross-Action.

Case No. 15-cv-03630-MEJ
|
Signed 11/02/2016

**Attorneys and Law Firms**

Harvey William Stein, Law Offices of Harvey W. Stein, Oakland, CA, for Plaintiff.

Harry Girard Lewis, Cornerstone Law Group, San Francisco, CA, Jesse R. Callahan, Loose, Brown, Hobkirk, and Callahan, P.C., Phoenix, AZ, Ryan Mark Ferrell, Newport Trial Group, Newport Beach, CA, for Defendant.

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT**

Re: Dkt. No. 36

MARIA-ELENA JAMES, United States Magistrate Judge

**INTRODUCTION**

**\*1** At its core, this case consists of a simple breach of contract claim. But to decide whether the parties' business agreement is enforceable, the Court must navigate the conflict created by the prohibition of medical marijuana under federal law and the legalization medical marijuana under California law. Specifically, this Order addresses whether Defendant and Cross-Claimant Sara Gullickson is excused from performing her obligations under a contract formed in California because the contract relates to the medical marijuana industry. Pending before the Court is Gullickson's Motion for Summary Judgment, in which she asks the

Court to invalidate the parties' agreement under the federal Controlled Substances Act, 21 U.S.C. §§ 801 et seq. Mot., Dkt. No. 36. Plaintiff and Cross-Defendant Dharminder Mann filed an Opposition (Opp'n, Dkt. No. 37), and Gullickson filed a Reply (Reply, Dkt. No. 38). The Court held a hearing on the matter on September 1, 2016 (Dkt. No. 41) and then ordered Supplemental Briefing (Dkt. No. 42). Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **DENIES** Gullickson's Motion for the following reasons.

**BACKGROUND** [1]

Around March 2014, Mann sold two businesses to Gullickson through a Stock Purchase Agreement: (1) Illinois DP, LLC a/k/a Dispensary Permits.com ("DP") a consulting business for state-regulated marijuana dispensary or cultivation licenses; and (2) weGrow Enterprises, Inc. ("weGrow") a franchise hydroponic retail operation (collectively, the "Companies"). Stock Agmt, Dkt. No. 36-3. Gullickson, as consideration, forgave a $10,000 loan to Mann and executed a Promissory Note ("Note") agreeing to pay Mann an additional $400,000 in three installments. Mann alleges Gullickson has failed to make payments as required under the Note. *See* Note, Dkt. No. 36-6 (included with the Complaint and a "Notice of Default of Promissory Note" sent to Gullickson).

The parties did not spend much time describing the nature of the Companies at issue or the precise nature of their business, but the parties' agreements provide some assistance. The Stock Agreement indicates weGrow is a franchisor and its franchisees agree to "operate a retail outlet...that sells hydroponic and related plant growing equipment and which provides seminars, information and assistance on plant growing techniques (including how to grow cannabis)." Stock Agmt., Ex. G-1 (attaching "Franchise Disclosure Agreement" of weGrow), available at ECF p.24. The "market" for franchisees' "products and services include "hydroponic farming operations, hydroponic hobbyists, and medical marijuana patients." *Id.* This agreement further recognizes that Mann "currently serves as President, the University of Cannabis (www.UniCann.com), the largest online University for medical marijuana in the world" and indicates weGrow also had a "hydroponic retail outlet" that "provides services to assist medical marijuana patients in creating their own cannabis gardens" including by offering "cannabis seminars" and "on-site doctors to recommend cannabis cards and on-site technicians to build [their] customers' grow rooms."

*Id.* at ECF p.25-26. As to DP, a draft agreement entitled "Dispensary Permits Medical Marijuana Business Plan Development and Consulting Services Agreement" indicates DP's business is to help facilitate the "procurement" of a "medical marijuana dispensary license" for other entities and to those other entities to "apply[ ] for and prospectively open[ ] and operate[ ] a Medical Marijuana Dispensary facility." DP Consulting Agmt. at ECF p.3 & 11, Dkt. No. 36-4. A press release indicates DP was formed "to Assist Entrepreneurs with Opening a Medical Marijuana Dispensary in Illinois" by assisting them with "obtaining a dispensary licenses or cultivation license in Illinois" and providing "hands on support to medical marijuana entrepreneurs." Press Release, Dkt. No. 36-5. There is no indication in the record these Companies directly grew or sold marijuana.

**\*2** Mann filed this action in California Superior Court on June 4, 2015, which Gullickson removed to this Court on August 7, 2015. Not. of Removal, Dkt. No. 1; *id.*, Ex. A (Compl.). Mann asserts a breach of contract claim, alleging Gullickson defaulted on the Note and requests relief in the form of the alleged remaining principal and other remedies permitted by the parties' contracts, including interest and attorneys' fees. Compl. ¶¶ 7, 9-10. Gullickson filed a cross-complaint on August 7, 2015, asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, conversion, fraud, negligent misrepresentation, and intentional interference with prospective economic relations. Not. of Removal, Ex. C (Cross-Compl.). Gullickson asserts that, in April 2015, at the direction of Mann, the Companies' website manager took the DispensaryPermits.com and weGrowStore.com websites offline, allegedly resulting in substantial missed business opportunities for the Companies. *Id.* ¶ 11.

Gullickson filed this summary judgment motion on July 21, 2016. *See* Mot. She contends the parties' agreement is void *ab initio* because it relates to medical marijuana, which is still a prohibited substance under the federal Controlled Substances Act ("CSA"), even if legal in the states where the Companies operate and the parties' contracts were formed. *See* 🔖 21 U.S.C. §§ 841(a), 844(a) (prohibiting the use, distribution, possession, or cultivation of any marijuana). At the hearing on this matter, Gullickson conceded that her counterclaims would be subject to dismissal if the Court granted her summary judgment on the basis asserted in her motion.

Following the hearing, the Court permitted the parties to address three cases that might impact the Court's analysis in this matter: 🔖 *Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005); *Green Earth Wellness Center, LLC v. Atain Specialty Insurance Co.* (*Green Earth*), 163 F. Supp. 3d 821 (D. Colo. 2016); and 🔖 *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016). The Court also allowed the parties to submit supplemental evidence concerning the nature of the Companies' businesses sold through the parties' agreements and the status of the parties' performance under those agreements. *See* Order, Dkt. No. 42.

In a newly-filed declaration, Mann explains the "business of WeGrow [ ] dba DispensaryPermits.com, was to provide consulting and information services to persons desiring to engage in hydroponic farming" and to "provide consulting and documentation preparation services to persons or entities desiring to establish medical cannabis dispensaries and related businesses in states where such activities were legal." Mann Decl. at 2, Dkt. No. 43-1. He contends that "[a]t no time did these companies possess, cultivate or distribute cannabis plants." *Id.* Instead, he states "[o]ur income was derived solely from the sale of our consulting services and information packs and document preparation." *Id.* Mann contends Gullickson still owes him $225,000, the balance due on the Note and asserts she continues to own and operate the Companies. *Id.* at 3.

For her part, Gullickson now declares the "intent of the parties" was that Gullickson would make payments promised under the promissory note "with revenue derived from operating the marijuana businesses" Mann sold her and that Mann "was aware [she] could not pay for the businesses without such businesses generating revenue[.]" Suppl. Gullickson Decl. ¶ 2, Dkt. No. 44-1. She explains she "had no other means to pay for the businesses." *Id.* Gullickson also contends she "did not receive what Mann purports to have sold to [her,]" noting that Mann "represented to [her] that the businesses he was selling complied with all applicable laws." *Id.* ¶¶ 4, 8; *see also* Def.'s Suppl. Reply at 4 (Gullickson "clearly states that she did not get what she paid for") & 4-5 (arguing the "relief requested by Mann cannot be granted because it would 'mandate illegal conduct' " as Gullickson has "no other means by which to pay Mann" other than with revenue from the businesses), Dkt. No. 47. Gullickson does not say whether she plans to continue operating the Companies. She contends "[t]here is no evidence in the record that Gullickson knew or should have known of this

federal prohibition. The evidence is actually the opposite and undisputed; Gullickson relied on Mann and his attorneys in performing such legal analysis." Def.'s Suppl. Reply at 6; Suppl. Gullickson Decl. ¶¶ 7-8.

## LEGAL STANDARD

**\*3** Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also* *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a

genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

## DISCUSSION

### A. Legality of Medical Marijuana

California's Compassionate Use Act of 1996 ("CUA"), Cal. Health & Safety Code § 11362.5 (added by Initiative Measure, Prop. 215, as approved by voters on Nov. 5, 1996) gives a person who uses marijuana for medical purposes on a physician's recommendation a defense to certain state criminal charges involving the drug, including possession (Cal. Health & Safety Code §§ 11357 (unauthorized possession), 11362.5(d) (exempting approved patients and primary caregivers)). In 2004, the state legislature expanded the criminal immunities in the CUA through the Medical Marijuana Program ("MMP") (Cal. Health & Safety Code §§ 11362.7 et seq.). "Among other things, these statutes exempt the 'collective[ ] or cooperative[ ]...cultiva[tion]' of medical marijuana by qualified patients and their designated caregivers from prosecution or abatement under specified state criminal and nuisance laws that would otherwise prohibit those activities." *The Kind & Compassionate v. City of Long Beach*, 2 Cal. App. 5th 116, 120 (2016) (quotations omitted; edits in original).

Federal law, however, continues to prohibit marijuana, even by medical users. *See* 21 U.S.C. §§ 812 (controlled substances), 844(a) (penalties); *Gonzales v. Raich*, 545 U.S. 1, 26-29 (2005) (Congress' plenary power under the Commerce Clause includes the power to prohibit the local cultivation and use of marijuana in compliance with CUA's medicinal use provisions; "The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail."); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 491-95 (2001) (medical necessity not a defense to manufacturing and distributing marijuana). Marijuana is a schedule-I controlled substance under the CSA. *See* 21 U.S.C. § 802(6) (defining a controlled substance to include

any drug or substance "included in schedule I...of part B of this subchapter."); *id.* § 812(c), Schedule I at (c) (10). "By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study." *Gonzales*, 545 U.S. at 14 (citations omitted). The first section of the CSA declares that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2). California's enactment of CUA and the MMP does not affect the fact that marijuana, including medical marijuana, is prohibited under the CSA.

*See* McIntosh, 833 F.3d at 1176 (reiterating that "the CSA prohibits what the State Medical Marijuana Laws permit");

*see also* Ross v. RagingWire Telecomms., Inc., 42 Cal. 4th 920, 926 (2008) ("No state law could completely legalize marijuana for medical purposes because the drug remains illegal under federal law" (citations omitted)).

**\*4** Nevertheless, federal policy regarding enforcement of the CSA has been less than clear since 2009. *See* Green Earth, 163 F. Supp. 3d at 832 (finding federal government has given "conflicting signals...regarding marijuana regulation and enforcement since 2009"); *see also id.* n.7 (collecting, among other things, a memorandum from the United States Attorney General's Office concerning shifting priorities of CSA enforcement efforts for medical marijuana since 2009 in states that regulate medical marijuana use and cultivation); Opp'n at 8 (referencing similar instances demonstrating ambiguous actions by the federal government). Since that time, courts have grappled with how to resolve conflicts in states that authorized the use of medical marijuana.

In *Tracy v. USAA Casualty Insurance Co.*, the District Court of Hawaii ultimately granted Defendant USAA's summary judgment motion "because the cultivation of marijuana, even for the State-authorized medical use, violates federal law and the enforcement of an insurance policy under the particular circumstances of this case is contrary to public policy[.]" 2012 WL 928186, at \*1 (D. Haw. Mar. 16, 2012). The plaintiff allegedly grew marijuana plants for medical use and when several of these plants were stolen, she attempted to seek coverage as part of her homeowner's insurance policy with USAA, which included coverage for loss to "trees,

shrubs, and other plants." *Id.* When USAA refused to pay the full amount claims for the loss, the plaintiff sued for breach of contract. *Id.* The district court ultimately found that Hawaii law permitted courts to decline enforcing contracts where doing so would require a party to violate federal law, on the ground that such a result would be contrary to public policy. *Id.* at \*10-13. The court consequently held that "[t]o require Defendant to pay insurance proceeds for the replacement of medical marijuana plants would be contrary to federal law and public policy, as reflected in the CSA, *Gonzales*, and its progeny." *Id.* at \*13.

Federal policy has only become less clear since *Tracy*. As one court in this district recognized, a recent "directive of Congress in Section 538 of the Consolidated and Further Continuing Appropriations Act of 2015, Pub. L. 113-235, 128 Stat. 2130 (2014) ('2015 Appropriations Act'), [ ] ...prohibits the Department of Justice [DOJ] from expending any funds in connection with the enforcement of any law that interferes with California's ability to 'implement [its] own State law[ ] that authorize[s] the use, distribution, possession, or cultivation of medical marijuana.' " *United States of Am. v. Marin All. for Med. Marijuana*, 139 F. Supp. 3d 1039, 1040 (N.D. Cal. 2015), *appeal dismissed* (Apr. 12, 2016) (citing 2015 Appropriations Act § 538; some brackets in original) (interpreting § 538 to preclude enforcement of a permanent injunction prohibiting distribution of medical marijuana by a dispensary to the extent it complied with California law). Even more recently, Congress enacted § 542 of the Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2332-33 (2015), which "prohibits DOJ from spending money on actions that prevent the Medical Marijuana States' giving practical effect to their state laws that authorize the use, distribution, possession, or cultivation of medical marijuana." McIntosh, 833 F.3d at 1176-78 (holding that "at a minimum, § 542 prohibits DOJ from spending funds from relevant appropriations acts for the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws" and "prohibits the Department of Justice from preventing the implementation of the Medical Marijuana States' laws or sets of rules and only those rules that authorize medical marijuana use."). [2]

**\*5** In *Green Earth Wellness Center, LLC v. Atain Specialty Insurance Co.*, a district court addressed a breach of contract claim against this backdrop. 163 F. Supp. 3d at 823. Green

Earth operated a medical marijuana business, for which Atain provided commercial liability insurance. *Id.* Green Earth made two claims under its policy, both of which Atain denied. *Id.* The first claim was for damage to Green Earth's marijuana plants as a result of a wildfire; the second was for the theft of some of its marijuana plants. *Id.* Green Earth sued Atain for breach of contract, among other things. *Id. at 824.* Atain moved for summary judgment, arguing public policy based on the federal prohibition on marijuana required denying coverage for Green Earth's losses. *Id. at 826-27.* While the court acknowledged *Tracy*, it ultimately declined to follow that case, noting that "the nominal federal prohibition against possession of marijuana conceals a...nuanced (and perhaps even erratic) expression of federal Policy." *Id. at 832, 835.* The *Green Earth* court explained that "in light of several additional years [since *Tracy*] evidencing a continued erosion of any clear and consistent federal public policy in this area,....the Court declines Atain's indirect invitation to declare the Policy void on public policy grounds" and found that "Atain, having entered into the Policy of its own will, knowingly and intelligently, is obligated to comply with its terms or pay damages for having breached it." *Id. at 835.* The court consequently denied Atain's summary judgment motion.

To be clear, the Ninth Circuit has recently clearly stated that "[a]nyone in any state who possesses, distributes, or manufactures marijuana for medical or recreational purposes (or attempts or conspires to do so) is committing a federal crime" under the CSA. *McIntosh, 833 F.3d at 1179 n.5; see also Nixon,* 2016 WL 6068201, at *2 (citing *McIntosh* for the same proposition). But it is against the foregoing backdrop, with the seemingly "continued erosion of any clear and consistent federal public policy in this area[,]" that the Court must decide whether these contracts are enforceable.

## B. Framework for Assessing Enforceability of "Illegal" Contracts

Neither party explicitly addressed the choice of law issues associated with this case, but there is no dispute that California law appropriately governs. The parties' Stock Agreement states it shall be governed by and construed under California law (Stock Agreement ¶ 8.1), and the Note likewise states it "will be construed and enforced in accordance with California law, except to the extent that Federal laws pre-empt state law" (Note ¶ 12). In any event, the place of performance for these contracts is California, and thus California law properly applies. *See* Stock Agreement ¶¶ 2.3, 5; Note ¶

1; *see also Bassidji, 413 F.3d at 933* (where subject-matter jurisdiction is based on parties' diversity of citizenship, courts apply the choice-of-law principles of the forum state); *Kashani v. Tsann Kuen China Enter. Co.,* 118 Cal. App. 4th 531, 543 (2004) ("When...the parties have not designated an applicable law, courts have applied the law of the place of contracting or the place of performance in determining the legality of the contract.").

That said, where a party challenges enforcement of a contract based on the defense of illegality under federal law, there is some question about whether to apply state or federal law. *See Bassidji, 413 F.3d at 935-36.* The parties did not directly address this dispute in their papers. Nonetheless, the Court need not conclusively resolve the matter here. For purposes of ruling on this Motion, the Court is bound by the Ninth Circuit's recognition that "[b]oth federal law and California law begin from the core proposition that whatever flexibility may otherwise exist with regard to the enforcement of 'illegal' contracts, courts will not order a party to a contract to perform an act that is in direct violation of a positive law directive, even if that party has agreed, for consideration, to perform that act." *Id. at 936.*

Under California law, a contract must have a "lawful object." Cal. Civ. Code § 1550(3). "The object of a contract is the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." *Id.* § 1595. Contracts without a lawful object are void. *Id.* § 1598. California Civil Code section 1668 provides that a contract that has as its object a violation of law is "against the policy of the law." Civil Code section 1667 elaborates that "unlawful" means: "1. Contrary to an express provision of law; [¶] 2. Contrary to the policy of express law, though not expressly prohibited; or, [¶] 3. Otherwise contrary to good morals." *See also id.* § 1441 ("A condition in a contract, the fulfillment of which is....unlawful...is void"). California courts have held that a lawful contract "must not be in conflict either with express statutes or public policy"—as a corollary, "[a] contract that conflicts with an express provision of the law is illegal and the rights thereto cannot be judicially enforced." *Vierra v. Workers' Comp. Appeals Bd.,* 154 Cal. App. 4th 1142, 1148 (2007) (citations omitted); *see also Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal. 4th 83, 124 (2000) ("If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced.").

**\*6** "California law includes federal law" and thus, "a violation of federal law is a violation of law for purposes of determining whether or not a contract is unenforceable as contrary to the public policy of California." *Kashani*, 118 Cal. App. 4th at 543 (citing *People ex rel. Happell v. Sischo*, 23 Cal. 2d 478, 491 (1943) (federal law is "the supreme law of the land (U.S. Const., art. VI, sec. 2) to the same extent as though expressly written into every state law")). Gullickson urges the Court to use this rule to void the parties' contracts entirely—but both California courts and the Ninth Circuit have applied a more nuanced approach.

In *Kashani v. Tsann Kuen China Enterprise Co.*, a California Court of Appeal affirmed the trial court's grant of summary judgment to the defendants argued that the parties' contract was unenforceable as it was illegal and against public policy because it involved trade and commerce with Iran. 118 Cal. App. 4th at 540. In doing so, however, the Court of Appeal did not hold that any agreement that involves an illegal contract is necessarily void. On the contrary, it recognized that "[c]ourts in California have, depending on the facts, carved out exceptions to the statutory and judicial language that illegal contracts are void and unenforceable." *Id.* at 541-42 (collecting cases). The court found that "[t]hese authorities give examples of illegal contracts that can be enforced." *Id.* at 559 n.6. Moreover, the court recognized that one of the principles courts apply in deciding whether an illegal contract can be enforced is whether a party calls on a court to order another party to carry out an illegal object. *Id.* at 540 (citing *Wong v. Tenneco, Inc.*, 39 Cal. 3d 126, 135 (1985) ("No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out..." (quotations omitted; ellipsis in *Kashani*)); *Lewis & Queen v. N.M. Ball Sons*, 48 Cal. 2d 141, 150 (1957) ("[T]he courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act.")). The court, however, recognized that "[a]lthough the courts generally will not enforce an illegal contract, in some cases the statute making the conduct illegal, in providing for a fine or administrative discipline, excludes by implication the additional penalty involved in holding the illegal contract unenforceable [citation]. Sometimes the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. 'In each such case, how the aims of policy can best be achieved depends on *the kinds of illegality and the particular facts involved.*' " *Id.* at 557 (brackets and emphasis in original) (quoting *M. Arthur Gensler, Jr.,*

*& Assocs., Inc. v. Larry Barrett, Inc.*, 7 Cal. 3d 695, 703 (1972)) (finding in that case that "[e]ven if a determination of enforceability of patently illegal contracts can be based on the particular facts, plaintiffs have not established any basis for departing from the practice of courts generally not to enforce a contract in violation of law.").

In another case, the California Supreme Court similarly found that "[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' " *Asdourian v. Araj*, 38 Cal. 3d 276, 292 (1985) (quoting *Southfield v. Barrett*, 13 Cal. App. 3d 290, 294 (1970)). The *Asdourian* Court recognized that " '[i]n each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts.' " *Id.* (quoting *South Tahoe Gas Co. v. Hofmann Land Improvement Co.*, 25 Cal. App. 3d 750, 759 (1972)). While the *Asdourian* Court recognized California adheres to the "well-settled rule that the courts will not aid a party whose claim for relief rests on an illegal transaction[,]" *Wong*, 39 Cal. 3d 126, it found that "[t]his rule is based on the rationale that 'the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice between the parties.' " *Asdourian*, 38 Cal. 3d at 291 (quoting *Southfield*, 13 Cal. App. 3d at 294).

**\*7** In *Bassidji v. Goe*, the Ninth Circuit considered a breach of contract action in which enforcement of the contract would have furthered trade with an Iranian company in contravention of a federal Executive Order. 413 F.3d at 928-39. The Ninth Circuit analyzed federal case law and California precedents, including *Kashani*, to investigate "[n]uanced approaches to the illegal contract defense, taking into account such considerations as the avoidance of windfalls or forfeitures, deterrence of illegal conduct, and relative moral culpability," and those considerations "remain viable in federal court and represent no departure from [federal precedent]...[so] long as the relief ordered does not mandate illegal conduct." *Id.* at 937-38.[3] The Court ultimately concluded that enforcement of the contract would mandate illegal conduct because requiring the defendant to pay the plaintiff "would provide funds to the Iranian economy, paying for goods in Iran[,]" in direct contravention of a federal Executive Order. *Id.* at 939. In doing so, the Ninth Circuit indicated when assessing the enforceability of "illegal

contracts," courts should consider whether a remedy exists "that would not require a court to order a legal violation." *Id.*

The foregoing case law demonstrates that even where contracts concern illegal objects, where it is possible for a court to enforce a contract in a way that does not require illegal conduct, the court is not barred from according such relief. However, if, as in *Bassidji,* the enforcement of a contract would require the court to order illegal conduct, such contracts are unenforceable. This Court must therefore assess whether a remedy exists that would not require it to order a violation of the CSA.

## C. Legality of a Remedy

Gullickson contends the contracts are for "marijuana businesses" and that enforcing the contract "would 'mandate illegal conduct' (the operation of the medical marijuana businesses)" because "she has no other means" to pay Mann other than to operate the businesses. Def.'s Suppl. Reply at 4-5. Mann, however, contends the contracts do not "provide or even contemplate that any party to the contract will possess, distribute or cultivate marijuana, medical or otherwise." Pl.'s Suppl. Br. at 2, Dkt. No. 45. He asserts the contracts "only provide[ ] for consultation services and providing information" and only in jurisdictions where medical marijuana is legal. *Id.* at 2-3. At the hearing, Mann's attorney also raised First Amendment concerns, indicating freedom of speech protects the businesses' activities of providing information and consultation services in this field.

Having reviewed the materials in the record, the Court finds it could grant relief in this case that does not require Gullickson to violate the CSA. Mann's suit seeks Gullickson's full payment for the businesses he sold to her. Mandating that payment does not require Gullickson to possess, cultivate, or distribute marijuana, or to in any other way require her to violate the CSA. *Cf.* *Bassidji,* 413 F.3d at 939 (enforcing contract by forcing defendant to pay the plaintiff would violate the Executive Order because it would "provide funds to the Iranian economy, paying for goods in Iran"). Gullickson attempts to argue otherwise by suggesting "she has no other means" to pay Mann other than to operate the Companies. Def.'s Suppl. Reply at 4. But this argument fails for at least two reasons. First, semantically Gullickson's declaration only says that she "*had* no other means to the pay for the businesses" (Suppl. Gullickson Decl. ¶ 2 (emphasis added)) — there is no evidence in the record that she currently *has* no other means to pay for the Companies. Second, even if

these businesses are Gullickson's only livelihood, she has not shown the only way to operate them is in a way that violates the CSA. In other words, if the Court ordered payment, and Gullickson's only way to pay was by making these businesses operational, that situation would not necessarily require Gullickson to be involved in the medical marijuana industry; Gullickson has not shown otherwise. Thus, unlike *Bassidji,* ordering payment on the parties' contract would not mandate illegal conduct. [4] *Cf.* *In re Medpoint Mgmt., LLC,* 528 B.R. 178, 186 (Bankr. D. Ariz. 2015), *vacated in part on other ground,* 2016 WL 3251581 (B.A.P. 9th Cir. June 3, 2016) ( "[t]he Court will not enter an order for relief which would then result in the appointed chapter 7 trustee necessarily violating federal law (the CSA) in carrying out his or her duties under the [Bankruptcy] Code" where United States Trustee stated there were no legal, non-marijuana assets a trustee could lawfully operate and administer); *Tracy,* 2012 WL 928186, at *13 (declining to order defendant to pay for the replacement of medical marijuana plants).

**\*8** In a more nuanced approach, Gullickson suggests that if the Court enforces the agreement it would be "condoning and encouraging" illegal conduct. Def.'s Suppl. Reply at 4-5 ("[I]t is axiomatic that enforcing the contract would flash a green light to any persons concerned about whether they should start helping others cultivate, manufacture, sell and distribute marijuana. A federal court enforcing these contracts would therefore only encourage commerce related to marijuana."). But again, the Court finds no merit to this argument. Enforcing the contract in this case is not endorsing the cultivation, possession, or distribution of marijuana. It is not making broad pronouncements about that any and all contracts related to marijuana or medical marijuana will be enforceable. [5] Rather, considering the particular facts and circumstances of this case, the Court finds no reason why the parties' agreement would not be enforceable.

Even if the object of the agreement were illegal, "[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' " *Asdourian,* 38 Cal. 3d at 292 (quoting *Southfield,* 13 Cal. App. 3d at 294). Courts also consider "the avoidance of windfalls or forfeitures, deterrence of illegal conduct, and relative moral culpability[.]" *Bassidji,* 413 F.3d at 937-38. Questions of fact remain as to whether Gullickson's avoidance of the agreement would result in her unjust enrichment. There

is no dispute that she has not yet paid full amount on the contract. *See* Mann Decl. at 3; Suppl. Gullickson Decl. ¶ 3. Additionally, there is no indication Gullickson plans to abandon these businesses. Rather, Gullickson attests she has spent in excess of $50,000 to rebuild the companies' websites, Suppl. Gullickson Decl. ¶ 5, which could reasonably indicate she plans on maintaining them. Moreover, given the ever-changing political climate concerning medical marijuana—and marijuana in general [6]—as well the federal government's current lack of enforcement of the CSA in Medical Marijuana States, the Court cannot ignore the potential likelihood of a windfall for Gullickson if she is able to dodge the contract at this point. A reasonable trier of fact could find Gullickson is likely to be unjustly enriched if the parties' agreement is not enforced.

As to moral culpability, while Gullickson contends she acted without a lawyer and on the advice of Mann's counsel, this does not absolve her of responsibility. As any first year law student is taught, *ignorantia juris non excusat*—"Ignorance of the Law is no excuse." The record here also leaves no doubt that Gullickson knew—or should have known—that marijuana was illegal under federal law. Indeed, the Stock Agreement with its Franchise Disclosure Agreement, which Gullickson repeatedly cites, notes that "the sale of cannabis for medicinal or other purposes is...not permitted in the majority of states and or under federal law." *See* Stock Agmt., Ex. G-1 (attaching "Franchise Disclosure Agreement" of weGrow), available at ECF p.25; *see also* In re Medpoint, 528 B.R. at 187 ("Medpoint did not dupe [its creditors] into entering the medical marijuana business. [They] signed various loan or other documents which expressly stated that Medpoint was in the medical marijuana business and that, under federal law, the production, marketing and sale of marijuana was and remains illegal."). A reasonable jury could find that moral culpability lies with both parties.

**\*9** The "deterrence of illegal conduct" factor likewise favors enforcement of the agreement. Gullickson herself disputes whether she received the benefit of the bargain of the parties' agreement, arguing Mann did not perform as required by the contract and induced her into the contract with misrepresentations about the Massachusetts market. Suppl. Gullickson Decl. ¶ 3; Cross-Compl. ¶¶ 11-12, 15, 20. If these allegations are true, Mann stands to gain from unlawful conduct. And the same may be true if Gullickson is permitted to avoid complete payment under the contract. *See* Opp'n at 10 ("[Gullickson] will have escaped the obligation of paying the Plaintiff $225,000 for the business she purchased" and Mann

"will have received only a fraction of the sales price and be left with no remedy to recover the valuable assets he sold."). While the nature of the businesses may indirectly involve medical marijuana, other potentially illicit conduct would be deterred if the agreement was enforced, i.e., nonpayment for services rendered pursuant to a contract.

Finally, as the California Supreme Court acknowledged in *Asdourian*, " 'the extent of enforceability...depend[s] upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts.' " 38 Cal. 3d at 292 (quotation omitted). The federal government's concern over the CSA's medical marijuana prohibition has waned in recent years, and the underlying policy purporting to support this prohibition has been undermined. *See* Conant, 309 F.3d at 641-42 (Kozinski, J., concurring) (discussing uses and benefits of medical marijuana). Several states and territories have set up systems authorizing and regulating the use, possession, distribution, and cultivation of medical marijuana. *See* McIntosh, 833 F.3d at 1179 n.3 (listing 43 jurisdictions permitting medical marijuana). As *McIntosh* acknowledges, the federal government is currently proscribed from enforcing the CSA in these jurisdictions, which have independently determined that marijuana has a medical benefit for their citizens. Indeed, California has found that "seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief." Cal. Health & Safety Code § 11362.5(b)(1)(A). Given the federal government's wavering policy on medical marijuana in states that regulate this substance, and California's expressed policy interest in allowing qualified patients to obtain medical marijuana, the purported illegality here is not one the Court finds to mandate non-enforcement of the parties' contract.

## CONCLUSION

Based on the analysis above, the Court hereby **DENIES** Gullickson's Motion for Summary Judgment. The parties shall meet and confer and file a joint Case Management Statement by November 10, 2016.

IT IS SO ORDERED.

Dated: November 2, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 6473215

## Footnotes

1  The following facts are undisputed for summary judgment purposes, unless otherwise noted.

2  Plaintiff argues the DOJ "is prohibited by statute from interfering with the business [Gullickson] purchased from Plaintiff." Opp'n at 6. As the Ninth Circuit acknowledged, however, "Congress could restore funding tomorrow, a year from now, or four years from now, and the government could then prosecute individuals who committed offenses while the government lacked funding." *McIntosh*, 833 F.3d at 1179 n.5; *see also United States v. Nixon*, No. 16-50097, ___ F.3d ____, 2016 WL 6068201, at *2 (9th Cir. Oct. 17, 2016) ("On its face, the appropriations rider restricts only the DOJ's ability to use certain funds on particular prosecutions during a specific fiscal year.").

3  The Ninth Circuit's decision relied heavily on Supreme Court's opinion in *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982). As the Ninth Circuit acknowledges, *Kaiser Steel* considered "the difference between cases in which the courts are asked to order an illegal act and cases in which the relief sought does not seek directly to order illegal activity." *Bassidji*, 413 F.3d at 936 (citing *Kaiser Steel*, 455 U.S. at 79-80); *see Kaiser Steel*, 455 U.S. at 79 (indicating the question was whether Kaiser Steel's promise to contribute "could be enforced without commanding unlawful conduct.").

4  A fundamental difference between this case and *Bassidji* is that object of the contract here is not *necessarily* illegal. The parties agreed Gullickson would pay Mann to purchase the Companies, which provide "consulting and information services to persons desiring to engage in hydroponic farming" and "consulting and documentation preparation services to persons or entities desiring to establish medical cannabis dispensaries and related businesses in states where such activities are legal." Mann Decl. at 2. There is no evidence in the record that the Companies actually possess, use, cultivate, or distribute marijuana—medical or otherwise. Moreover, while Gullickson argues the businesses "conspire" to do so (Def.'s Suppl. Reply at 6), this so-called conspiracy is appears to be based entirely on providing information to customers. *See* Opp'n at 9 & 10 ("No authority is presented for the proposition that it is illegal to provide information only concerning medical marijuana"); *see also id.* at 5 (discussing cases concerning potential limitations on aiding-and-abetting theory). In *Conant v. Walters*, the Ninth Circuit affirmed an injunction prohibiting federal officials from revoking a physician's registration, or even investigating a physician's conduct, based on the physician's recommendation that a patient use marijuana. 309 F.3d 629, 639 (9th Cir. 2002) (indicating rejection of government's argument that a doctor's "recommendation" of marijuana encourages illegal conduct by the patient), *cert. denied* *Walters v. Conant*, 540 U.S. 946 (2003); *see also* *Thomas v. Collins*, 323 U.S. 516, 535 (1945) (on First Amendment grounds, striking down a statute criminalizing solicitation of union membership without state license because the statute did not distinguish between solicitation and advocacy and so "put[ ] the speaker...wholly at the mercy...of his hearers and consequently of whatever inference may be drawn as to his intent and meaning"); *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) ("We need not decide whether the plaintiffs' primary objective...would have involved an unlawful act. The mere fact that citizens urge their government to adopt measures that may be unlawful does not deprive the speech involved of its First Amendment protection."). If the government regulated such speech related to medical

marijuana, courts would have to consider the "governmental interest at stake" to help "determine whether [such] a restriction on that expression is valid." *Texas v. Johnson*, 491 U.S. 397, 406-07 (1989). The parties did not specifically brief the First Amendment issue, but the Court is not convinced at this point that the object of the parties' contract is necessarily illegal.

5    The Court is cognizant of the difficulties businesses and individuals in the medical marijuana industry face given the tenuous legal environment surrounding this subject matter; indeed, the typical legal protections may be unavailable to such businesses and individuals in many circumstances. *See* Sam Kamin & Viva R. Moffat, *Trademark Laundering, Useless Patents, and Other Ip Challenges for the Marijuana Industry*, 73 Wash. & Lee L. Rev. 217 (2016) (discussing challenges for businesses operating in the medical marijuana industry.

6    *See, e.g.*, Col. Const. art. XVIII, § 16 (Personal Use and Regulation of Marijuana); *see also* Cal. Prop. 64 ("Marijuana Legalization Initiative" on ballot for 2016 election).

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Green Earth Wellness Center, LLC v. Atain Specialty
Insurance Company, D.Colo., February 17, 2016

2012 WL 928186
Only the Westlaw citation is currently available.
United States District Court, D. Hawai'i.

Barbara TRACY, Plaintiff,

v.

USAA CASUALTY INSURANCE
COMPANY, Defendant.

Civil No. 11–00487 LEK–KSC.
|
March 16, 2012.

**Attorneys and Law Firms**

Ivan L. Van Leer, Pahoa, HI, for Plaintiff.

Kevin P.H. Sumida, Ward F.N. Fujimoto, Kevin Sumida &
Associates, Honolulu, HI, for Defendant.

## *ORDER GRANTING DEFENDANT'S*
## *MOTION FOR SUMMARY JUDGMENT*

LESLIE E. KOBAYASHI, District Judge.

**\*1** Before the Court is Defendant USAA Casualty Insurance
Company's ("Defendant") Motion for Summary Judgment
("Motion"), filed on October 20, 2011. Plaintiff Barbara
Tracy ("Plaintiff") filed her memorandum in opposition on
January 10, 2012, and Defendant filed its reply on January 13,
2012. This matter came on for hearing on January 30, 2012.
Appearing on behalf of Defendant was Ward Fujimoto, Esq.,
and appearing on behalf of Plaintiff was Ivan Van Leer, Esq.
Plaintiff filed her Supplemental Declaration in Opposition
("Plaintiff's Supplemental Declaration") on February 6, 2012,
and Defendant filed its Supplemental Reply Memorandum
in Support of Its Motion for Summary Judgment [ECF No.
13] ("Supplemental Reply") on February 9, 2012. After
careful consideration of the Motion, supporting and opposing
documents, and the arguments of counsel, Defendant's
Motion is HEREBY GRANTED because the cultivation of
marijuana, even for the State-authorized medical use, violates
federal law and the enforcement of an insurance policy under
the particular circumstances of this case is contrary to public
policy, as set forth more fully below.

## BACKGROUND

Plaintiff filed the instant action in the Circuit Court of the
Third Circuit, State of Hawai'i, on July 11, 2011. Defendant
removed the action on August 10, 2011, based on diversity
jurisdiction.

Plaintiff's Complaint alleges that Defendant breached the
parties' insurance coverage contract by failing to pay
Plaintiff's insurance claims for stolen property. Plaintiff, who
owns and resides at a property in the Puna District of the State
and County of Hawai'i, purchased a homeowners insurance
policy from Defendant ("the Policy") on May 18, 2010.
[Complaint at ¶¶ 1, 5.] On or about July 30, 2010, twelve
plants were stolen from Plaintiff's property. Nine of the twelve
plants were fully matured cannabis sativa, commonly known
as marijuana plants. The remaining three plants were less
mature plants. [Id. at ¶ 7.] Plaintiff states that she "lawfully
possessed, grew, nurtured and cultivated the plants consistent
with the laws of the State of Hawaii ... permitt[ing] individuals
to possess and grow marijuana for medical purposes[.]" [Id.
at ¶ 12(b). [1] ]

Plaintiff asserts that she is entitled to coverage under the
Policy for the loss of these plants because the Policy includes
coverage for loss to " 'trees, shrubs, and other plants.' " [Id. at
¶ 8 (quoting Policy, Replacement Cost Coverage—Personal
Property HO–728 (08–97) at ¶ 3).] Plaintiff alleges that she
notified Defendant of the loss of the twelve plants, presenting
a claim of $4,000 for each mature plant and $3,200 for each of
the less mature plants, for a total of $45,600. [Id. at ¶¶ 9–10 .]
Defendant initially agreed to pay Plaintiff's claim and issued
a payment to Plaintiff for the loss, but Plaintiff claimed that
the amount was insufficient. [Id. at ¶ 12(e).]

Plaintiff alleges that, on or about May 27, 2011, Defendant
notified Plaintiff that it would not make any further
payment for the loss because Plaintiff did not have an
insurable interest in the plants, which could not be lawfully
replaced. Plaintiff argues that Defendant could have inspected
Plaintiff's property at any time during the Policy period, and
Defendant had notice that Hawai'i law permits individuals
such as Plaintiff to lawfully grow marijuana for medical
purposes. [Id. at ¶¶ 11–12(c).] Plaintiff alleges that the Policy
specifically allows for coverage of irreplaceable "plants",
without excluding any particular type of plant, with payment

in the form of actual cash value. She alleges that insurers regularly pay for such claims. [*Id.* at ¶¶ 12(d)-(e).]

**\*2** Although not clearly enumerated in the Complaint, Plaintiff's claims appears to be as follows: breached the insurance contract; unreasonable/bad faith denial of her insurance claim; and a violation of Haw.Rev.Stat. Chap. 480. Plaintiff seeks: the fair and reasonable value of the stolen plants; contract and Chapter 480 damages; reasonable attorneys' fees and court costs; and interest. [*Id.* at pgs. 4–5.]

### I. *Motion for Summary Judgment*

In the instant Motion, Defendant argues that it is entitled to judgment as a matter of law because Plaintiff lacks an insurable interest in the marijuana plants under State and Federal law, and therefore Defendant is not obligated to provide coverage under the Policy.

First, in order to have an insurable interest, the insured's interest in the property must be "lawful" property under Hawai'i Revised Statutes § 431:10E–101. Second, Hawai'i law generally prohibits the enforcement of illegal contracts, and Plaintiff cannot insure her marijuana plants unless her possession was legal. [Mem. in Supp. of Motion at 3 (citing Haw.Rev.Stat. § 1–5).] Third, Defendant argues that Hawaii's medical marijuana law, Haw.Rev.Stat. § 329–125, does not create an insurable interest because it merely "provides an affirmative defense to marijuana-related state law crimes for the medical use of marijuana." [*Id.* at 4 (emphasis omitted).] Defendant argues that there is no affirmative defense for the promotion, purchase, or sale of marijuana, even for medical use, and therefore Plaintiff cannot legally use the insurance proceeds to purchase replacement marijuana plants. Further, Haw.Rev.Stat. § 329–124 expressly disclaims insurance coverage for medical marijuana. [*Id.* at 4–5.]

Defendant points out that the statutory law in force and effect at the time an insurance policy is issued becomes part of the insurance contract, as though it were expressly written into the contract. Further, courts should not interpret insurance contracts to provide coverage when coverage would be against public policy, such as when an insured's activities relate to an illegal controlled substance. [*Id.* at 5–6.]

Defendant contends that requiring insurance coverage for marijuana plants would be against federal public policy because coverage presupposes that the insured will purchase, sell, and/or distribute marijuana plants with insurance

proceeds. Defendant emphasizes that in *Gonzales v. Raich,* 545 U.S. 2195 (2005), the United States Supreme Court held that distributing, possessing, and using marijuana, even for medical purposes, are illegal under federal law with the sole exception of federally-approved research. [*Id.* at 10.] Defendant acknowledges that "[w]hile the *Gonzales* Court did not specifically hold that federal prohibitions on marijuana preempts contrary state medical marijuana laws, a growing number of other courts have applied *Gonzales* and/or the Supremacy Clause, and have so held." [*Id.* at 12.] Defendant argues that Hawaii's medical marijuana laws do not purport to legalize medical use and do not require insurance coverage for medical use. Even if Hawai'i law required insurance coverage for medical marijuana use, such coverage would conflict with, and therefore be preempted by, federal law prohibiting such use. [*Id.* at 15.]

**\*3** Defendant argues that, at a minimum, it is entitled to summary judgment on Plaintiff's extra-contractual claims for unreasonableness/bad faith and Plaintiff's Chapter 480 claim. Defendant argues that Plaintiff did not produce any evidence of Defendant's bad faith, and Plaintiff failed to meet her burden of showing that Defendant unreasonably denied her claim. Defendant argues that, where an insurance company denies a claim based on a correct interpretation of the law, there can be no unreasonable denial of insurance coverage. Even if there is a dispute over the validity of Plaintiff's claim, the dispute demonstrates that Defendant reasonably disagreed with Plaintiff's claim based on an unresolved legal issue. [*Id.* at 15–17.]

Defendant further argues that Haw.Rev.Stat. Chapter 431, Article 13 preempts Haw.Rev.Stat. Chapter 480 in the area of insurance. Defendant contends that Chapter 480 does not apply because an insurance beneficiary is not a "consumer", and an insurance policy does not involve "goods" or "services". [*Id.* at 17–18.] Defendant emphasizes that Haw.Rev.Stat. § 480–11(b) expressly exempts insurance companies from the scope of Chapter 480. Defendant also argues that Chapter 480 should not apply to the insurance claims in this case because of Haw.Rev.Stat. § 329–124, which states that Hawaii's medical marijuana laws do not require insurance coverage for the medical use of marijuana. [*Id.* at 20–21.]

Even if Chapter 480 applies, Defendant argues that there is no evidence to support Plaintiff's claim that the denial of her insurance claim constituted a violation of Chapter 480. At a minimum, the denial was supported by a reasonable

legal argument. There is nothing to support Plaintiff's conclusory allegation that Defendant violated Chapter 480, and Defendant contends that it is entitled to summary judgment on Plaintiff's Chapter 480 claim. [*Id.* at 21–23.]

Defendant also argues that it is entitled to summary judgment on the issue of Plaintiff's entitlement to punitive damages. Under Hawai'i law, the issue of punitive damages cannot be submitted to the jury based upon evidence of merely a possible breach of contract or mere inadvertence, mistake, or errors of judgment. Defendant emphasizes that Hawai'i law requires more than just the commission of a tort; clear and convincing evidence of wanton, oppressive, malicious, or wilful conduct is required. Defendant contends that, because it had at least a reasonable legal basis to deny Plaintiff's claim, Plaintiff cannot establish any conduct that would warrant punitive damages. [*Id.* at 23–26.]

### III. *Plaintiff's Memorandum in Opposition*

In her Memorandum in Opposition, Plaintiff states that the facts of this case are essentially uncontested. She emphasizes that the Policy expressly covers losses to " 'Trees, Shrubs and Other Plants' " caused by, *inter alia,* theft. [Mem. in Opp. at 1–2 (quoting Policy at 3–4).]

Plaintiff argues that Defendant is a sophisticated and experienced insurance company that likely provided similar services in Hawai'i for many years prior to the events at issue in this case. Plaintiff contends that the Policy, which Defendant prepared, specifically contemplated the coverage of marijuana plants, and Defendant was aware of both the federal law and Hawai'i law relevant to this issue when it issued the Policy. [*Id.* at 2–3.] Plaintiff states that paragraph J on page 13 of the Policy excludes coverage for losses involving illegal narcotics, including cocaine, LSD, and marijuana, but the Policy expressly states that the exclusion " 'does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.' " [*Id.* at 3 (emphasis omitted).]

**\*4** Plaintiff points out that Haw. Admin. R. § 23–202–13(b)(1) provides that an individual who qualifies for medical marijuana use may supply herself by growing the plant at her home address. Plaintiff argues that there is no basis for Defendant to deny coverage because Defendant was on notice that, by covering "trees, shrubs or plants", it was required to cover marijuana/cannabis plants where the insured was a licensed medical marijuana

user. The contract terms are not ambiguous and must be interpreted according to their plain meaning. Further, Hawai'i courts honor the objectively reasonable expectations of the parties concerning insurance coverage, and the objectively reasonable expectations are construed from a layperson's perspective. Plaintiff emphasizes that Defendant initially acknowledged coverage and paid $8,801.90 on Plaintiff's claim in February 2011. Defendant only raised its objections after Plaintiff sought more money on May 27, 2011. [*Id.* at 3–4.]

Plaintiff argues that she had an insurable interest in the plants, as defined by § 431:10E–101, because she is permitted by Hawai'i law to have the plants for medical use. She contends that, by enacting Haw.Rev.Stat. § 329–127, which governs the return of marijuana an other paraphernalia after seizure, the State Legislature acknowledged that a medical marijuana user has a substantive interest in the source of her medical marijuana. Where the government seizes the plants, they must be returned to the owner upon a showing that the owner was in compliance with the medical marijuana statute. Plaintiff emphasizes that courts widely hold that an "insurable interest" need not be a free and unencumbered interest. [*Id.* at 5.]

Plaintiff argues that Defendant's reliance on Haw.Rev.Stat. § 329–124 is misplaced because the statute only addresses medical insurance coverage for marijuana use. As to the bad faith claim, Plaintiff argues that her allegations are sufficient because a plaintiff can establish a bad faith claim by proving that the insurer unreasonably handled claims, denied claims, or interpreted its policies. Plaintiff contends that this issue is fact specific and is not appropriate for summary judgment. [*Id.* at 6–7.]

### IV. *Defendant's Reply*

In its Reply, Defendant emphasizes that Plaintiff does not contest that an insured must have an "insurable interest" in property to insure it, or that marijuana, even when used for medical purposes, is a Scheduled I controlled substance under 21 U.S.C. §§ 841(a) and 812(c). Plaintiff has not cited any authority for the proposition that medical marijuana is legally insurable, nor has she responded to Defendant's argument that a contract insuring marijuana would be inconsistent with public policy under federal law. Defendant also reiterates that § 329–125 merely provides an affirmative defense for the use of medical marijuana; neither it nor any other statute provides a similar defense for the promotion, purchase, or sale of marijuana. Thus, medical

marijuana plants cannot be insured because purchasing replacement plants with insurance proceeds would be illegal. Defendant also points out that nothing in ⬜ § 329–124 limits the provision to health insurance. Thus, pursuant to ⬜ § 329–124, Defendant is not required under Hawai'i law to provide insurance for medical marijuana. [Reply at 3–5.]

**\*5** Defendant argues that the general view precludes insurance coverage of a controlled substance or an insured's activities relating to that substance. Plaintiff has not cited any contrary law. Thus, even if medical marijuana was insurable under Hawai'i law, such insurance would be contrary to federal law, which would preempt Hawai'i law. [*Id.* at 5–7.]

Defendant also argues that Plaintiff's reliance on exclusion 1(j) on page 13 of the Policy is misplaced because exclusions cannot create coverage which did not already exist under the terms of a policy and the applicable law. Further, exclusion 1(j) does not directly apply in this case because it addresses personal liability, not payments for the insured's medical coverage. Even if the exclusion did apply, it expressly precludes coverage for marijuana. [*Id.* at 7 n. 3.]

Defendant reiterates that Plaintiff has not presented any evidence of unreasonableness or bad faith, particularly because she has not presented any affidavits or declarations setting forth specific facts. Thus, there is no genuine issue of material fact for trial. Defendant also emphasizes that, pursuant to Fed.R.Evid. 408, evidence of its prior settlement payment for her insurance claim is not admissible as evidence of Defendant's alleged obligation to provide coverage. Similarly, Defendant argues that Plaintiff has not presented any evidence showing a genuine issue of material fact regarding either her Chapter 480 claim or her allegation that she is entitled to punitive damages. [*Id.* at 8–11.]

**IV. *Supplemental Briefing***

At the hearing on the Motion, this Court raised the issue whether the twelve plants that were the subject of Plaintiff's insurance claim exceeded an "adequate supply" of marijuana and rendered her ineligible to lawfully use marijuana for medical purpose. *See* ⬜ Haw.Rev.Stat. §§ 329–122(a), ⬜ 329–121; *State v. Vincent,* No. 27357, 2009 WL 120308, at \*1 (Hawai'i Ct.App. Jan. 20, 2009). The Court permitted the parties to file supplemental briefing on this issue.

Plaintiff's Supplemental Declaration states that she resides with her significant other, Greg J. Rodenbaugh, who is the caretaker for Alicia Ell. Plaintiff, Mr. Rodenbaugh, and Ms. Ell all have medical marijuana licenses from the State, and all three licenses give Plaintiff's address as the location of the marijuana. [Pltf.'s Suppl. Decl. at ¶¶ 1–2, Exh. B.] Plaintiff therefore argues that she was legally authorized to have the nine mature marijuana plants and the three immature plants which were the subject of her insurance claim at her residence. Further, she emphasizes that Section I—Property Coverages, Coverage C—Personal Property insures personal property owned by others when the personal property is in the insured's residential premises. [*Id.* at ¶¶ 2–3.]

In its Supplemental Reply, Defendant argues that Plaintiff made binding admissions in the Complaint that she possessed all twelve plants which were the subject of her claim. Defendant also challenges Plaintiff's Supplemental Declaration because Plaintiff does not have personal knowledge about the marijuana possession of non-parties; she only has personal knowledge of her own marijuana certificate and use. Even if the Court considers Plaintiff's Supplemental Declaration, it does not establish that Plaintiff complied with the strict limitations on joint possession of an adequate supply of marijuana pursuant to Haw.Rev.Stat. § 329–125. [*Id.* at 2–3, 8.]

## *DISCUSSION*

**\*6** At the outset, the Court notes that federal jurisdiction in this case is based on diversity. [Notice of Removal at ¶ 3.] This district court has recognized that:

> Federal courts sitting in diversity apply state substantive law and federal procedural law. *See Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC,* 632 F.3d 1056, 1060 (9th Cir.2011)* ("When a district court sits in diversity, or hears state law claims based on supplemental jurisdiction, the court applies state substantive law to the state law claims."); ⬜ *Zamani v. Carnes,* 491 F.3d 990, 995 (9th Cir.2007)* ("Federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law." (quotations omitted)). When interpreting state law, a federal court is bound by the decisions of a state's highest court. *Trishan Air, Inc. v. Fed. Ins. Co.,* 635 F.3d 422, 427 (9th Cir.2011)*. In the absence of a governing state decision, a federal court attempts to predict how the highest state court would decide the issue, using

intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance. *Id.; see also* 📄 *Burlington Ins. Co. v. Oceanic Design & Constr., Inc.,* 383 F.3d 940, 944 (9th Cir.2004) ("To the extent this case raises issues of first impression, our court, sitting in diversity, must use its best judgment to predict how the Hawaii Supreme Court would decide the issue." (quotation and brackets omitted)).

*U.S. Fire Ins. Co. v. Estate of James Campbell,* Civil No. 11–00006 LEK–KSC, 2011 WL 6934566, at *3 (D. Hawai'i Dec. 30, 2011) (citation omitted).

Before the Court can address the substantive issues in this matter, it must address the procedural issue of whether Plaintiff's submission of the Policy is properly before the Court.

### I. *The Policy*

Plaintiff submitted a copy of the Policy with her memorandum in opposition. [Dkt. no. 24–1.] The Court notes that Plaintiff failed to file a concise statement of facts, as required by Local Rule 56.1(b), and that the memorandum in opposition does not include a declaration authenticating the Policy. Although the Court does not condone the failure to follow court rules, insofar as Defendant has not contested the accuracy of Plaintiff's exhibit, the Court will exercise its discretion and consider the document. *See* Fed.R.Evid. 901(b)(4) (evidence may be authenticated by examining its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.").

The Policy states, in pertinent part:

  3. Trees, Shrubs and Other Plants. We cover trees, shrubs, plants or lawns, on the residence premises, for loss caused by the following Perils Insured Against: ... Vandalism or malicious mischief or Theft.

   We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be available for any one tree, shrub or plant. We do not cover property grown for business purposes.

   **\*7** This coverage is additional insurance.

[Policy, Agreement (Homeowners 3R Special Form (04–93) HO–93 Program), Section I—Property Coverages, Additional Coverages, at 4 of 17 (emphases omitted).]

Plaintiff also cites the following exclusion as evidence that the Policy's coverage encompasses medical marijuana plants:

  1. Coverage E—Personal Liability and Coverage F—Medical Payments to Others do not apply to bodily injury or property damage:

   ....

  j. arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a controlled substance(s). Controlled substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

[*Id.,* Section II—Exclusions, at 12 of 17 to 13 of 17 (emphases omitted).]

### II. *Hawaii's Medical Marijuana Laws*

The State Legislature enacted Hawaii's medical-use-of-marijuana laws in 2000.2000 Haw. Sess. Laws Act 228 at 595–96. Haw.Rev.Stat. § 329–125(a) states: "A qualifying patient or the primary caregiver may assert the medical use of marijuana as an affirmative defense to any prosecution involving marijuana under this [part] or chapter 712; provided that the qualifying patient or the primary caregiver **strictly complied with the requirements of this part.**" (Alteration in original) (emphasis added). Some of the requirements that a qualifying patient must comply with are set forth in 📄 Haw.Rev.Stat. § 329–122(a), which states:

  Notwithstanding any law to the contrary, the medical use of marijuana by a qualifying patient shall be permitted only if:

   (1) The qualifying patient has been diagnosed by a physician as having a debilitating medical condition;

   (2) The qualifying patient's physician has certified in writing that, in the physician's professional opinion, the potential benefits of the medical use of marijuana would likely outweigh the health risks for the particular qualifying patient; and

**(3) The amount of marijuana does not exceed an adequate supply .**

(Emphasis added.) 🚩 Haw.Rev.Stat. § 329–121 states:

> "Adequate supply" means an amount of marijuana jointly possessed between the qualifying patient and the primary caregiver that is not more than is reasonably necessary to assure the uninterrupted availability of marijuana for the purpose of alleviating the symptoms or effects of a qualifying patient's debilitating medical condition; provided that **an "adequate supply" shall not exceed three mature marijuana plants, four immature marijuana plants, and one ounce of usable marijuana per each mature plant.**

(Emphasis added.) The applicable administrative rule reiterates the limits on the numbers of mature and immature marijuana plants. 🚩 Haw. Admin. R. § 23–202–13(c). The rule also provides that an individual who exceeds an adequate supply is "not exempted from the criminal laws of the State."

🚩 § 23–202–13(d).

### III. *Plaintiff's Supply*

**\*8** At the hearing on the Motion, the Court *sua sponte* raised the issue that Plaintiff's twelve marijuana plants, including nine mature plants, exceeded an adequate supply. Plaintiff's failure to strictly comply with the statutes regarding an adequate supply would mean that she could not avail herself of the Hawai'i medical marijuana laws. *See Vincent,* 2009 WL 120308, at \*1 (noting that, unless the patient meets the requirements of 🚩 § 329–122(a), "a qualifying patient is not permitted to use marijuana for medical purposes"). If Plaintiff's possession of the marijuana plants was not protected by the Hawai'i medical marijuana laws, it would be unnecessary for the Court to rule upon the arguments that the parties addressed in their memoranda because the Hawai'i state courts recognize the common law principle that a court may refuse to enforce a contract that is illegal or in violation

of public policy. *See, e.g.,* 🚩 *Inlandboatmen's Union of the Pac., Hawai'i Region, Marine Div. of Int'l Longshoremen's & Warehousemen's Union v. Sause Bros., Inc.,* 77 Hawai'i 187, 194, 881 P.2d 1255, 1262 (Ct.App.1994) (citations omitted).

In Plaintiff's Supplemental Declaration, Plaintiff states that both she and Mr. Rodenbaugh, who resides with her, have medical licenses to grow marijuana plants. In addition, their friend, Ms. Ell has a medical marijuana license listing Mr. Rodenbaugh as Ms. Ell's caretaker.[2] [Pltf.'s Suppl. Decl. at ¶ 2.] Plaintiff submitted a copy of the three Patient Identification Certificates from the State Medical Marijuana Registry. Each certificate identifies Plaintiff's residence as the "Location of Marijuana". [*Id.* at ¶ 1, Exh. B.] Plaintiff asserts that, based on the three certificates, there were lawfully nine mature marijuana plants at her residence, and the three immature plants were for Ms. Ell's supply. [*Id.* at ¶ 2.] Defendant objects to Plaintiff's submissions because they are contrary to the admissions in the Complaint and because Plaintiff does not have personal knowledge of Mr. Rodenbaugh's and Ms. Ell's possession of marijuana plants.

First, the Court finds, for purposes of the instant Motion only, that Plaintiff has sufficient personal knowledge regarding Mr. Rodenbaugh's and Ms. Ell's marijuana plants because they are kept at Plaintiff's residence. This Court will therefore consider both the representations about those plants in Plaintiff's Supplemental Declaration and Plaintiff's submission of Mr. Rodenbaugh's and Ms. Ell's certificates from the State Medical Marijuana Registry.[3]

The Complaint alleges that, in general, the Policy constitutes Defendant's agreement that "in the event that plaintiff suffered a loss to her personal property at her residence, ... the defendant would pay to plaintiff the replacement costs of such loss." [Complaint at ¶ 5.] Specifically, the Complaint alleges: "[o]n or about July 30, 2010, plaintiff suffered an event where twelve (12) plants were taken from her property ... and that the taking constituted a theft[;]" [*id.* at ¶ 7;] and "plaintiff lawfully possessed, grew, nurtured and cultivated the plants consistent with the laws of the State of Hawaii[;]" [*id.* at ¶ 12.b]. Defendant emphasizes that the Complaint does not mention Mr. Rodenbaugh's and Ms. Ell's ownership of some of the plants which were the subject of Plaintiff's insurance claim. Plaintiff argues that the allegations of the Complaint do not constitute an admission that she owned all twelve plants because the Policy covers " 'personal property owned by: 1. others while the property is on the part of the residential

premises occupied by an insured.' " [Pltf.'s Suppl. Decl. at ¶ 3 (quoting the Policy, Section 1—Property Coverages, Coverage C).] Without ruling on the issue whether Section 1 —Property Coverages, Coverage C applies, this Court FINDS that there are genuine issues of material fact as to whom the marijuana plants stolen from Plaintiff's residence were legally attributable. Thus, this Court cannot conclude as a matter of law that Plaintiff's possession of marijuana plants excluded her from the Hawai'i medical marijuana laws. See Fed.R.Civ.P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The Court now turns to the issues addressed in the parties' memoranda.

**IV.** *Insurable Interest*

 **\*9**  Defendant first argues that Plaintiff does not have an insurable interest in the marijuana plants. Haw.Rev.Stat. § 431:10E–101 states:

> No contract of insurance on property or of any interest therein or arising therefrom shall be enforceable except for the benefit of persons having an insurable interest in the property insured. Insurable interest means any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage.

Defendant does not dispute that Plaintiff had a substantial economic interest in the plants. The dispute in this case centers around whether Plaintiff's interest in the plants was lawful. Defendant emphasizes that Haw.Rev.Stat. § 329– 125 "does not legalize the medical use of marijuana, but provides an affirmative defense to marijuana-related state law crimes for the medical use of marijuana." [Mem. in Supp. of Motion at 4 (emphasis omitted).] Further, Defendant argues that  Haw.Rev.Stat. § 329–124 "expressly disclaims any legislative intent to require insurance coverage for marijuana, even for medical purposes[.]" [*Id.* at 5.]

There is no Hawai'i Supreme Court case law analyzing the Hawai'i medical marijuana laws. The Intermediate Court of Appeals ("ICA") has stated that § 329–125 "provides an affirmative defense to marijuana-related crimes." *State v. Manzano–Hill,* No. 29063, 2010 WL 359901, at \*1 (Hawai'i Ct.App. Jan. 27, 2010). The ICA, however, has cited  § 329–122(a) for "an entitlement to the medical use of marijuana[.]" *State v. Blagus,* No. 30016, 2010 WL 3759788, at \*2 (Hawai'i Ct.App. Sept. 27, 2010). It has also stated that "unless the foregoing requirements [of  § 329–122(a) ] are met, a qualifying patient is not permitted to use marijuana for medical purposes." *Vincent,* 2009 WL 120308, at \*1. It follows from the ICA's analysis that, if a qualifying patient meets the requirements of  § 329–122(a), and all other applicable provisions of Chapter 329, Part IX, [4] the patient is permitted to use marijuana for medical purposes.

In addition, the Court notes that, in enacting Chapter 329, Part IX, the Hawai'i State Legislature stated:

> The legislature finds that modern medical research has discovered a beneficial use for marijuana in treating or alleviating the pain or other symptoms associated with certain debilitating illnesses. There is sufficient medical and anecdotal evidence to support the proposition that these diseases and conditions may respond favorably to a medically controlled use of marijuana.

> The legislature is aware of the legal problems associated with the legal acquisition of marijuana for medical use. However, the legislature believes that medical scientific evidence on the medicinal benefits of marijuana should be recognized. Although federal law expressly prohibits the use of marijuana, the legislature recognizes that a number of states are taking the initiative in legalizing the use of marijuana for medical purposes. Voter initiatives permitting the medical use of marijuana have passed in California, Arizona, Oregon, Washington, Alaska, Maine, Nevada, and the District of Columbia.

>  **\*10**  The legislature intends to join in this initiative for the health and welfare of its citizens. However, the legislature does not intend to legalize marijuana for other than medical purposes. The passage of this Act and the policy underlying it does not in any way diminish the legislature's strong public policy and laws against illegal drug use.

> Therefore, the purpose of this Act is to ensure that seriously ill people are not penalized by the State for the use of marijuana for strictly medical purposes when the patient's treating physician provides a professional opinion that the

benefits of medical use of marijuana would likely outweigh the health risks for the qualifying patient.

2000 Haw. Sess. Laws Act 228, § 1 at 595–96.

Defendant emphasizes that the Legislature expressly disclaimed any requirement that insurers provide coverage for the medical use of marijuana. Haw.Rev.Stat. § 329–124 states: "This part shall not be construed to require insurance coverage for the medical use of marijuana." Plaintiff responds that § 329–124 "seems more likely to relate to health insurance coverage, wherein health insurers would not have to reimburse medical marijuana users...." [Mem. in Opp. at 6.] Plaintiff, however, cites no authority for her interpretation of § 329–124. The plain language of the statute does not support such a limited interpretation, and there is nothing in the legislative history that suggests the Legislature intended to limit § 329–124 to medical insurance. *Cf.* *Steigman v. Outrigger Enters., Inc.,* 126 Hawai'i 133, 148–49, 267 P.3d 1238, 1253–54 (2011) ("Although the statutory language of HRS § 663–31 is plain and unambiguous, we may resort to the legislative history to confirm this interpretation of the statute." (citing *E & J Lounge Operating Co. v. Liquor Comm'n of City & County of Honolulu,* 118 Hawai'i 320, 335, 189 P.3d 432, 447 (2008) ("Legislative history may be used to confirm interpretation of a statute's plain language."); *State v. Entrekin,* 98 Hawai'i 221, 228, 47 P.3d 336, 343 (2002) ("Although we ground our holding in the statute's plain language, we nonetheless note that its legislative history confirms our view."))). Even assuming, *arguendo,* that § 329–124 applies to all forms of insurance, that interpretation does not compel summary judgment for Defendant. Section 329–124 merely states that the State does not **require** insurers to provide coverage for medical marijuana usage; it does not **preclude** insurers from agreeing to provide coverage for medical marijuana usage.

Thus, the Court predicts that the Hawai'i Supreme Court would hold that a qualifying patient who is in strict compliance with the Hawai'i medical marijuana laws has a lawful interest in her marijuana supply for purposes of Haw.Rev.Stat. § 431:10E101. This Court therefore CONCLUDES that Plaintiff had a insurable interest in her marijuana plants which were the subject of her insurance claim.

## V. *Marijuana and Federal Law*

**\*11** Defendant next argues that, even if Plaintiff has an insurable interest in her marijuana plants under Hawai'i law, Defendant is precluded from providing coverage for the plants because it would be contrary to federal law and federal public policy.

As noted, *supra,* under Hawai'i law, a court may refuse to enforce a contract that is illegal or in violation of public policy. *Inlandboatmen's Union,* 77 Hawai'i at 194, 881 P.2d at 1262 (some citations omitted) (citing *Aiea Lani Corp. v. Hawaii Escrow & Title Inc.,* 64 Haw. 638, 647 P.2d 257 (1982) (contract for "kickbacks" which was illegal is not enforceable); *Wilson v. Kealakekua Ranch,* 57 Haw. 124, 551 P.2d 525 (1976) (a contract will be unenforceable if the violation of public policy was intended to protect the public from fraud and incompetence, but not if the public policy was only *malum prohibitum* or to raise revenue); *Miehlstein v. King Market Co.,* 24 Haw. 540 (1918) (a contract involving a city official performing work he is prohibited from performing by law violates public policy and is unenforceable); *Goo Wan Hoy v. McKeague,* 24 Haw. 263 (1918) (promissory note was void because consideration for the note was intoxicating liquors sold without a liquor license which was prohibited by criminal law); *Cosmopolitan Fin. Corp. v. Runnels,* 2 Haw.App. 33, 625 P.2d 390 (1981) (the law will not be used to enforce any part of an illegal bargain)); *see also* Haw.Rev.Stat. § 1–5.

Defendant's position is that, even if a layperson would have reasonably expected that Plaintiff's Policy included coverage for the loss of medical marijuana plants,[5] this Court should not enforce that interpretation of the Policy[6] because it would be contrary to federal public policy. Defendant argues that *Gonzales v. Raich,* 545 U.S. 1 (2005), held that the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.,* prevails over any state law permitting the medical use of marijuana. In *Gonzales,* the respondents were California residents who used marijuana for medical purposes under California's Compassionate Use Act and pursuant to the recommendation of their licensed, board-certified, family practitioners. The respondents sued the Attorney General of the United States and the head of the Drug Enforcement Administration, seeking injunctive and declaratory relief prohibiting the enforcement of the CSA to the extent that it prevented them from possessing, obtaining, or manufacturing marijuana for their personal medical use. *Id.* at 6–7. The

Supreme Court vacated the Ninth Circuit's opinion reversing the denial of a preliminary injunction and ordering the district court to enter the injunction. *Id.* at 8, 33. The Supreme Court held that the intrastate, non-commercial cultivation, possession, and use of marijuana was still subject to the CSA. *Id.* at 32–33. In so holding, the Supreme Court stated that:

The CSA designates marijuana as contraband for *any* purpose; in fact, by characterizing marijuana as a Schedule I drug, Congress expressly found that the drug has no acceptable medical uses. Moreover, the CSA is a comprehensive regulatory regime specifically designed to regulate which controlled substances can be utilized for medicinal purposes, and in what manner.... Thus, even if respondents are correct that marijuana does have accepted medical uses and thus should be redesignated as a lesser schedule drug, the CSA would still impose controls beyond what is required by California law.... [T]he mere fact that marijuana-like virtually every other controlled substance regulated by the CSA-is used for medicinal purposes cannot possibly serve to distinguish it from the core activities regulated by the CSA.

**\*12** ....

... [L]imiting the activity to marijuana possession and cultivation "in accordance with state law" cannot serve to place respondents' activities beyond congressional reach. The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail....

*Id.* at 27–29 (emphasis in original).

Other federal courts have repeatedly recognized that *Gonzales* establishes that the possession and cultivation of marijuana for medical use is illegal under federal law, even when it is permitted under state law. For example, in *United States v. Stacy,* the United States District Court for the Southern District of California stated:

Under California's Compassionate Use Act ( Cal. Health & Safety Code § 11362.5), a patient who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician, cannot be prosecuted under Cal. Health & Safety Code § 11357, relating to the possession of marijuana, or Cal. Health & Safety Code § 11358, relating to the cultivation of marijuana. However, **California law does not purport to render the use of medical marijuana**

**lawful under federal law. In fact, the use of medical marijuana remains unlawful under federal law.** *See* Gonzales v. Raich, 545 U.S. 1, 27, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (explaining that even if marijuana is used "for personal medical purposes on the advice of a physician," it is still considered contraband under the CSA, which designates marijuana as contraband "for *any* purpose"); *United States v. Katz,* 2010 WL 183863, \*1 (9th Cir. Jan. 19, 2010) (vacating pretrial detention order, which modified defendant's bond order to permit defendant to use and possess marijuana for medical purposes in compliance with California law, because it is illegal to possess marijuana under federal law); *United States v. Scarmazzo,* 554 F.Supp.2d 1102, 1105 (E.D.Cal.2008) ("The use of medical marijuana remains unlawful.").

No. 09cr3695 BTM, 2010 WL 4117276, at \*5 (S.D.Cal. Oct. 18, 2010) (some emphases added).

In *United States v. Hicks,* the United States District Court for the Eastern District of Michigan stated:

**It is indisputable that state medical-marijuana laws do not, and cannot, supercede federal laws that criminalize the possession of marijuana.** *See* Gonzales, 545 U.S. at 29, 125 S.Ct. 2195 ("The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail.");

*United States v. $186,416.00 in U.S. Currency,* 590 F.3d 942, 945 (9th Cir.2010) ("The federal government has not recognized a legitimate medical use for marijuana, however, and there is no exception for medical marijuana distribution or possession under the federal Controlled Substances Act[.]"); *United States v. Landa,* 281 F.Supp.2d 1139, 1145 (N.D.Cal.2003) ("[O]ur Congress has flatly outlawed marijuana in this country, nationwide, including for medicinal purposes.").

**\*13** 722 F.Supp.2d 829, 833 (E.D.Mich.2010) (alterations in *Hicks* ) (some citations omitted) (emphasis added). Further, when it enacted Hawaii's medical marijuana laws, the State Legislature expressly recognized that the use of marijuana was prohibited under federal law. 2000 Haw. Sess. Laws Act 228, § 1 at 595.

The rule under Hawai'i law that courts may decline to enforce a contract that is illegal or contrary to public policy applies where the enforcement of the contract would violate federal law. The employer in *Inlandboatmen's Union* argued that the

court should decline to enforce one aspect of the arbitrator's interpretation of the collective bargaining agreement because its implementation would cause the employer to violate 46 U.S.C. § 8104 (1988). 7 77 Hawai'i at 190–91, 881 P.2d at 1258–59. The Hawai'i Supreme Court, however, ultimately held that the employer had not established that the arbitrator's finding conflicted with § 8104. Id. at 196, 881 P.2d at 1264.

Insofar as Defendant seeks summary judgment, this Court must view the evidence in the light most favorable to Plaintiff.

See Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir.2006) (noting that, on a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor" (citations, quotation marks, and brackets omitted)). The Court therefore assumes, for purposes of the instant Motion, that the "Trees, Shrubs and Other Plants" provision of the Policy covered the loss of Plaintiff's medical marijuana plants. Even in light of that assumption, this Court cannot enforce the provision because Plaintiff's possession and cultivation of marijuana, even for State-authorized medical use, clearly violates federal law. To require Defendant to pay insurance proceeds for the replacement of medical marijuana plants would be contrary to federal law and public policy, as reflected in the CSA, Gonzales, and its progeny. The Court therefore CONCLUDES that, as a matter of law, Defendant's

refusal to pay for Plaintiff's claim for the loss of her medical marijuana plants did not constitute a breach the parties' insurance contract. The Court GRANTS Defendant's Motion as to Plaintiff's breach of contract claim.

## VI. *Plaintiff's Remaining Claims*

Insofar as this Court has concluded that it cannot enforce the provision of the Policy which purportedly covers the loss of medical marijuana plants, this Court also CONCLUDES that, as a matter of law, Defendant's denial of Plaintiff's claim did not constitute either a violation of Haw.Rev.Stat. Chapter 480 or the tort of unreasonableness/bad faith. The Court therefore GRANTS Defendant's Motion as to Plaintiff's Chapter 480 claim and Plaintiff's unreasonableness/bad faith claim.

## *CONCLUSION*

On the basis of the foregoing, Defendant's Motion for Summary Judgment, filed October 20, 2011, is HEREBY GRANTED. The Court directs the Clerk's Office to enter judgment in favor Defendant and to close the case.

**\*14** IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 928186

## Footnotes

1    The only exhibit attached to Defendant's separate and concise statement of facts in support of the Motion ("Defendant's CSOF"), [filed 10/20/11 (dkt. no. 14),] is the Complaint. [Dkt. no. 14–2.] Defendant contends that there are no genuine issues of fact for trial. For the purposes of the instant Motion, Defendant assumes, but does not admit, that the factual allegations of the Complaint are true. [Def.'s CSOF at 1–2.]

2    Haw. Admin. R. § 23–202–13 states, in pertinent part:

(a) A qualifying patient who possesses a registry identification certificate issued pursuant to section 329–123, Hawaii Revised Statutes, may engage in and a registered primary caregiver of the patient may assist in, the medical use of marijuana only as justified to mitigate the symptoms or effects of the qualifying patient's debilitating medical condition.

(b) The medical marijuana shall be grown only at the following locations:

(1) The qualifying patient's home address; or

(2) The primary caregiver's home address or other location owned or controlled by the qualifying patient or the primary caregiver that is approved by the administrator and designated on the registry certificate issued by the department.

3   This Court also considers Plaintiff's representations about her own marijuana plants and her certificate, about which she clearly has personal knowledge.

4   Chapter 329, Part IX includes Haw Rev. Stat. § 329–121 to § 329–128.

5   The Hawai'i Supreme Court has stated: adherence to the plain language and literal meaning of insurance contract provisions is not without limitation. We have acknowledged that because insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer. Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson.

   *Guajardo v. AIG Hawai'i Ins. Co.,* 118 Hawai'i 196, 202, 187 P.3d 580, 586 (2008) (quoting *Dairy Rd. Partners v. Island Ins. Co .,* 92 Hawai'i 398, 411–12, 992 P.2d 93, 106–07 (2000)). The Hawai'i Supreme Court has also stated: "[t]he objectively reasonable expectations of [policyholders] and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations. These 'reasonable expectations' are derived from the insurance policy itself...." *Del Monte Fresh Produce (Hawaii), Inc. v. Fireman's Fund Ins. Co.,* 117 Hawai'i 357, 368, 183 P.3d 734, 745 (2007) (citations and some quotation marks omitted) (some alterations in original).

6   There is no allegation that the alleged illegality of any provision of the Policy which arguably provides coverage for the medical marijuana plants rendered the Policy as a whole unenforceable. Under Hawai'i law, where part of a contract is illegal and the remainder is legal, a court should sever the illegal provision and enforce the legal portion of the contract, provided that the illegal provision "is not central to the parties' agreement."

   *Courbat v. Dahana Ranch, Inc.,* 111 Hawai'i 254, 263 n. 11, 141 P.3d 427, 436 n. 11 (2006) (citation and quotation marks omitted).

7   The Hawai'i Supreme Court in *Inlandboatsmen's Union* noted the recognition of the general rule regarding the enforcement of illegal contracts in connection with the limited public policy exception to the deference typically given to arbitration awards. 77 Hawai'i at 193–94, 881 P.2d at 1261–62.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D

Case 2:20-cv-00647-APG-NJK   Document 16-1   Filed 05/04/20   Page 35 of 42

Rideout v. CashCall, Inc., Not Reported in Fed. Supp. (2018)

KeyCite Overruling Risk - Negative Treatment

Overruling Risk U.S. Home Corporation v. Michael Ballesteros Trust, Nev., April 12, 2018

2018 WL 1220565
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Kevin RIDEOUT, Plaintiff,
v.
CASHCALL, INC., Defendant.

Case No. 2:16–cv–02817–RFB–VCF
|
Signed 03/07/2018
|
Filed 03/08/2018

**Attorneys and Law Firms**

David H. Krieger, Haines & Krieger, LLC, Henderson, NV, for Plaintiff.

David J. Merrill, David J. Merrill, P.C., Las Vegas, NV, for Defendant.

**ORDER**

**Defendant's Motion to Dismiss, or, in the Alternative, Motion for Stay and to Compel Arbitration**

RICHARD F. BOULWARE, II, UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

**\*1** Before the Court is Defendant CashCall, Inc. ("Defendant" or "CashCall")'s Motion to Dismiss, or, in the Alternative, Motion to Stay and to Compel Arbitration. (ECF No. 6). For the reasons stated below, the Court DENIES Defendant's Motion.

### II. BACKGROUND

Plaintiff Kevin Rideout ("Rideout" or "Plaintiff") filed a Complaint with Jury Demand against Defendant on December 7, 2016. (ECF No. 1). Plaintiff alleges violations of Nevada Revised Statues Chapter 604A.010 et seq. ("NRS 604A"), which incorporates the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692a to 1692j

("FDCPA"), as well as negligent and knowing and/or willful violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"). CashCall filed the instant Motion to Dismiss, or alternatively, Motion to Stay and Compel Arbitration, on February 3, 2017. (ECF No. 6). On February 8, 2017, Plaintiff filed his Response. (ECF No. 8). Defendant filed its Reply to Plaintiff's Response on February 27, 2017. (ECF No. 14). Magistrate Judge Cam Ferenbach entered a Scheduling Order on October 30, 2017. (ECF No. 25). Discovery was stayed pending the Court's order on the instant motion. (ECF No. 28).

On August 30, 2017, the Court held a hearing on the Defendant's Motion. The Court ordered the parties to submit supplemental briefing on the issue of whether the Court, if it decided that the disputed arbitration clause was enforceable, had the authority to require the arbitrator to apply federal law. Both Plaintiff and Defendant submitted their Supplemental Briefs on September 6, 2017. (ECF Nos. 20, 21).

### III. FACTUAL ALLEGATIONS

#### a. CashCall's Debt Collection Practices

The following factual allegations are taken from Plaintiff's Complaint. Plaintiff obtained a high interest loan with CashCall in the amount of $2500 ("the Debt") and dutifully maintained payments on the Debt. Plaintiff ultimately repaid over $10,000 in interest and principal payments on the Debt. After repaying the Debt, a representative at CashCall informed Plaintiff that the Debt was paid in full and he owed no further obligations to CashCall.

However, in September 2015, CashCall began to call Plaintiff to collect payment on the Debt. During the collection phone calls, CashCall informed Plaintiff that the Debt was in default and demanded payment. CashCall also called Plaintiff's wife and children to collect payment on the Debt. CashCall called Plaintiff, his wife, and his children regularly and multiple times per day on a daily basis. CashCall called Plaintiff from various numbers, including but not limited to: 1–844–302–2274; 1–267–885–2219 and 1–626–389–3322. CashCall called Plaintiff's cellular phone ending "9116" and landline ending "8785". CashCall also called Plaintiff before 9:00 a.m. PST and after 9:00 PM on numerous occasions to collect the Debt.

Rideout v. CashCall, Inc., Not Reported in Fed. Supp. (2018)

Case 2:20-cv-00647-APG-NJK   Document 16-1   Filed 05/04/20   Page 36 of 42

CashCall continued to call Plaintiff, Plaintiff's wife and Plaintiff's children despite Plaintiff disputing he owed any further payments on the Debt, informing CashCall that he repaid the Debt in full, and requesting that the calls cease. However, CashCall disregarded Plaintiff's requests and continued to call Plaintiff on his cellular phone and landline regularly to collect the Debt. CashCall also continued to call Plaintiff's wife and children to collect the Debt.

**\*2** On several occasions, but no later than in January 2016, during a phone conversation, Plaintiff demanded that CashCall cease contacting him to collect payment on the Debt. However, CashCall continued to place collection calls to Plaintiff and his family members to collect the Debt.

Plaintiff alleges that he has suffered and continues to suffer actual damages as a result of CashCall's unlawful conduct. Further, Plaintiff claims that CashCall's actions at all times herein were "willful." As a direct consequence of CashCall's harassing phone calls, acts, practices and conduct, the Plaintiff suffered and continues to suffer from anger, anxiety, emotional distress, frustration, rage, headaches, an upset stomach, heart palpitations, and has otherwise been totally annoyed by CashCall's intrusive and illegal collection efforts. Plaintiff has also lost the use of personal and family time while enduring these frustrations.

### b. The Underlying Loan Agreement

The following facts are taken from the Motion to Dismiss and attached Exhibits. Plaintiff borrowed $2500 from Western Sky Financial, LLC ("Western Sky"), an internet loan provider. [1] To obtain the loan, Plaintiff signed the Western Sky Consumer Loan Agreement ("Loan Agreement"). (ECF No. 6–1 at 5–10). The Loan Agreement contains what Defendant describes as an "explicit, reader-friendly, and extensive arbitration clause." (ECF No. 6 at 2). The Court incorporates by reference the Loan Agreement. Relevant provisions from the Loan Agreement are set forth below:

- "Unless you exercise your right to opt-out of arbitration in the manner described below, any dispute you have with Western Sky or anyone else under this loan agreement will be resolved by binding arbitration." (ECF No. 6–1 at 7).

- "You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall

be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." (ECF No. 6–1 at 8.)

- Arbitration is a means of having an independent third party resolve a Dispute. A 'Dispute' is any controversy or claim between you [the Borrower] and Western Sky or the holder or servicer of the Note. The term Dispute is to be given its broadest possible meaning .... A Dispute includes, by way of example and without limitation, any claim based upon marketing or solicitations to obtain the loan and the handling of or servicing of [the Borrower's] account .... For purposes of this Arbitration agreement, the term 'the holder' shall include Western Sky or the then-current note holder's employees, officers, directors, attorneys, affiliated companies, predecessors, and assigns, as well as any marketing, servicing, and collection representatives and agents." (ECF No. 6–1 at 8).

- "Regardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association [,] ... JAMS [,]... or an arbitration organization agreed upon by you and the other parties to the Dispute. The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate, including the limitations on the Arbitrator below." (ECF No. 6–1 at 8).

**\*3** • "THIS ARBITRATION PROVISION IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." (ECF No. 6–1 at 9).

- "In the event you opt out of Arbitration, any disputes hereunder shall nonetheless be governed under the laws of the Cheyenne River Sioux Tribal Nation." (ECF No. 6–1 at 9).

Case 2:20-cv-00647-APG-NJK   Document 16-1   Filed 05/04/20   Page 37 of 42

Rideout v. CashCall, Inc., Not Reported in Fed. Supp. (2018)

On August 18, 2012, Western Sky sold its interest in Plaintiff's loan to WS Funding, LLC, a wholly-owned subsidiary of CashCall. Following the sale, CashCall sent Plaintiff a Notice of Assignment, Sale or Transfer of Servicing Rights, in which CashCall notified Plaintiff that Western Sky sold his loan to WS Funding and that CashCall would service the loan. (ECF No. 6–1 at 12).

### IV. LEGAL STANDARD

#### a. Enforcement of Arbitration Clauses

##### i. Federal Law

The Federal Arbitration Act ("FAA") provides that a "written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA provides two methods for enforcing arbitration: (1) an order compelling arbitration of a dispute; and (2) a stay of pending litigation raising a dispute referable to arbitration. 9 U.S.C §§ 3, 4.

"By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985). The FAA limits the district court's role to determining (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement to arbitrate encompasses the claims at issue. Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175 (9th Cir. 2014). "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ...." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24–25 (1983). Thus, "[t]he standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the Act is phrased in mandatory terms." Republic of Nicar. v. Std. Fruit Co., 937 F.2d 469, 475 (9th Cir. 1991). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration

any dispute which he has not agreed so to submit." AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960)).

The determination of whether a particular issue should be determined by the arbitrator rather than the court is governed by federal law. Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). However, when deciding whether the parties agreed to arbitrate a certain matter, courts generally apply ordinary state law principles of contract interpretation. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

**\*4** Importantly, the Supreme Court has reiterated that arbitration clauses cannot effect a "substantive waiver of federally protected civil rights." 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 273 (2009). That is because "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 628 (1985).

Arbitration agreements may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. Rent–A–Ctr., West, Inc. v. Jackson, 561 U.S. 63, 68 (2010) (citation omitted). Unconscionability, as a generally applicable contract defense, is governed by state law. Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931, 939 (9th Cir. 2001). In Ticknor, the Ninth Circuit held that the FAA does not preempt state law governing the unconscionability of adhesion contracts. Id. at 935. When evaluating unconscionability, federal courts must "approximate state law as closely as possible" and be bound by the pronouncements of the state's highest court. Id. at 939 (citations omitted). "Federal courts sitting in diversity look to the law of the forum state in making a choice of law determination." Id. at 937 (citation omitted).

##### ii. State Law

Although public policy favors enforcing arbitration clauses under Nevada law, courts may invalidate arbitration provisions as unconscionable. D.R. Horton, Inc. v. Green, 96 P.3d 1159, 1162 (Nev. 2004). " 'Generally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a ... clause as unconscionable.' However, less evidence of substantive unconscionability is required in cases involving great procedural unconscionability." Id. (citations omitted). "A clause is procedurally unconscionable when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract. Procedural unconscionability often involves the use of fine print or complicated, incomplete or misleading language that fails to inform a reasonable person of the contractual language's consequences." Id. In terms of substantive unconscionability, the Nevada Supreme Court has adopted the formulation of the inquiry used by the Ninth Circuit and explains that "where an arbitration agreement is concerned, the agreement is unconscionable unless the arbitration remedy contains a 'modicum of bilaterality.' " Id. at 1165 (quoting Ting v. AT&T, 319 F.3d 1126, 1149 (9th Cir.), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003)).

### b. Motion to Dismiss an Arbitrable Action

Section 3 of the FAA provides for a stay of legal proceedings whenever the issues in a case are within the reach of an arbitration agreement. 9 U.S.C. § 3. Although the statutory language supports a mandatory stay, the Ninth Circuit has interpreted this provision to allow a district court to dismiss the action. See Sparling v. Hoffman Const. Co., 864 F.2d 635, 638 (9th Cir. 1988). A request for a stay is not mandatory. Martin Marietta Aluminum, Inc. v. Gen. Elec. Co., 586 F.2d 143, 147 (9th Cir. 1978).

### V. DISCUSSION

### a. Unenforceability For Substantive Waiver of Federal Statutory Rights

**\*5** CashCall first argues that when Plaintiff obtained his loan, he agreed to arbitrate any disputes. CashCall

contends that, because Plaintiff entered into a contract with Western Sky—namely, the Loan Agreement—and the contract contains an extensive arbitration provision, a valid agreement therefore exists.

Plaintiff argues in response that there is no evidence that Plaintiff ever signed, reviewed, or consented to the Loan Agreement. Plaintiff also argues that the Loan Agreement is inadmissible hearsay. However, the Court rejects these arguments, as Plaintiff does not dispute that he obtained the loan from Western Sky—throughout his Complaint, he readily admits that he obtained the Debt and made payments on the Debt. (ECF No. 1 at 3–4).

Plaintiff additionally argues that the Loan Agreement should be invalidated as unenforceable and unconscionable, thereby preventing a finding of agreement to arbitrate. He cites two nonbinding circuit court cases in support of his argument —Hayes v. Delbert Services Corporation, 811 F.3d 666 (4th Cir. 2016) and Jackson v. PayDay Financial, LLC, 764 F.3d 765 (7th Cir. 2014). [2] In Hayes, a class of plaintiffs who received payday loans from Western Sky sued for violations of the FDCPA and TCPA. The plaintiffs signed loan agreements with Western Sky that included arbitration clauses similar to the one at issue here. Defendant loan servicer, who was assigned the loans at issue, moved to compel arbitration under the FAA. The district court granted the motion. The Fourth Circuit reversed, and found that "[t]his arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims." Hayes, 811 F.3d at 673. [3] "With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away." Id. at 673–74. The Fourth Circuit also found that the arbitration agreement's choice-of-law provisions could not be severed from the rest of the arbitration agreement. The Court cited to a Ninth Circuit case, which held: "It is a well-known principle in contract law that a clause cannot be severed from a contract when it is an integrated part of the contract." Graham Oil Co. v. ARCO Prod. Co., a Div. of Atl. Richfield Co., 43 F.3d 1244, 1248 (9th Cir. 1994), as amended (Mar. 13, 1995). The flawed provisions could not be severed because "the offending provisions go to the core of the arbitration agreement." Hayes, 811 F.3d at 676. Further, the Fourth Circuit found that the overall

Case 2:20-cv-00647-APG-NJK   Document 16-1   Filed 05/04/20   Page 39 of 42

Rideout v. CashCall, Inc., Not Reported in Fed. Supp. (2018)

loan agreement was problematic in light of the arbitration agreement, given that neither state nor federal law applied under the terms of the loan agreement. 📄 Id. at 673–74.

 **\*6** The facts in Jackson are slightly different than in Hayes and the instant case. There, plaintiffs litigated a Western Sky Loan Agreement with arbitration provisions that required all litigation to be conducted by a Cheyenne River Sioux tribal court and arbitrations to be done on the reservation. 📄 764 F.3d at 769. Additionally, plaintiffs asserted state rather than federal causes of action. Id. The Seventh Circuit had previously remanded to the district court to determine 1) whether tribal law was readily available to the public, and 2) whether the Cheyenne River Sioux has an arbitrator and arbitration method actually available to the public. 📄 Id. at 770. While evidence was presented to show that tribal law was available to the public, the Court found that other evidence revealed that the arbitration mechanism was "a sham and an illusion"—for example, the arbitrator selected in one case was selected by the owner of Western Sky, and like Western Sky's owner, was a member of the Cheyenne River Sioux. Id. The Court determined that the loan agreement's forum selection clause was unreasonable because no such forum existed. The loan agreement provided for arbitration conducted by the Cheyenne River Sioux— but "[t]he Cheyenne River Sioux Tribe 'does not authorize Arbitration,' it 'does not involve itself in the hiring of ... arbitrator[s],' and it does not have consumer dispute rules." 📄 Id. at 776 (alterations in original) (footnotes omitted). The Court also found the arbitration provision procedurally and substantively unconscionable under Illinois law. 📄 Id. at 778. Further, the Seventh Circuit found that exhaustion in tribal court was not required, as defendants had not established a colorable claim of tribal jurisdiction. 📄 Id. at 781–86.

CashCall argues that the Court is not bound by the Fourth Circuit's decision in Hayes, but makes no substantive arguments about the case. CashCall additionally attempts to distinguish Jackson, arguing that a different arbitration provision applied in that case, but it does not dispute the Seventh Circuit's finding that Cheyenne River Sioux law does not have consumer dispute rules or analogous rights for consumers. The Court agrees that the Loan Agreement at issue here purportedly authorizes arbitration before the AAA or JAMS. (ECF No. 6–1 at 8). The Court also notes that, unlike the arbitration provision at issue in Jackson, the arbitration provision here permits Plaintiff to select to

arbitrate within 30 miles of his home. (ECF No. 6–1 at 8). However, the Loan Agreement nonetheless states that "[t]he arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, *to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate.*" (ECF No. 6–1 at 8) (emphasis added). The Loan Agreement continues: "Any arbitration under this Agreement may be conducted either on tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Cheyenne River Sioux Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement." (ECF No. 6–1 at 8). In a few sections above that language, the Loan Agreement provides: "You [the Borrower] agree that any Dispute, except as provided below, will be resolved by Arbitration, *which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this agreement.*" (ECF No. 6–1 at 8). The Court thus finds that the Loan Agreement does not by its plain terms permit the application of any law as to permissible claims or the process for resolving disputes for such claims except that of the Cheyenne River Sioux. The Court further finds that CashCall has presented no evidence that such an arbitral forum exists under Cheyenne River Sioux law. See MacDonald, 2018 U.S. App LEXIS 4795, at \*11–12, 2018 WL 1056942 (noting lack of such an arbitral forum); Hayes, 811 F.3d 672–73 (accord).

The Court agrees with the reasoning of the court in Hayes and finds that the arbitration provisions in the Loan Agreement are unenforceable because the Loan Agreement's terms effect a waiver of substantive federal statutory rights by requiring that the arbitration apply Cheyenne River Sioux law. The Cheyenne River Sioux Tribal Constitution does not incorporate federal statutes or the rights conferred upon individuals by such statutes. See Cheyenne River Sioux Tribe Constitution (approved Dec. 27, 1936), https://www.loc.gov/law/help/american-indian-consts/PDF/36026282.pdf. CashCall acknowledges that the statutory rights conferred upon the Plaintiff by the TCPA and FDCPA do not exist under Cheyenne River Sioux law and it could not identify analogous rights that would exist. Indeed, the Agreement has chosen the only type of forum —tribal law—that exists in all states that could effect a waiver of federal statutory rights. See generally 📄 Plains

Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316 (2008) (explaining that "tribal sovereignty, it should be remembered, is a sovereignty outside the basic structure of the Constitution.") (citations omitted). The Court finds, however, that Congress did not intend for the FAA to be used as a means "to waive all of a potential claimant's federal rights."

🔖 Hayes, 811 F.3d at 675. As the Fourth Circuit aptly stated: "A party to an arbitration agreement may of course agree to waive certain rights as part of that agreement.... But a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." Id. The Court therefore finds the arbitration provisions in the Loan Agreement unenforceable and contrary to law, as Plaintiff cannot, based upon the facts of this case, waive substantive federal rights through a choice of law or forum selection clause. 🔖 Mitsubishi Motors Corp., 473 U.S. at 628.

*7 CashCall seeks to overcome this obvious legal impediment by unilaterally "stipulating" in its supplemental submission to the adjudication of these federal statutory rights in an arbitral forum governed by Cheyenne River Sioux law. Such a stipulation is farcical. First, the arbitrator acting under Cheyenne River Sioux law would be under no obligation to follow such a stipulation and actually could not pursuant to the contract which requires the application of Cheyenne River Sioux consumer dispute rules (which do not appear to exist) and law. Second, and more importantly, the Court does not find the clause to be severable as suggested by the proposed stipulation; CashCall cannot unilaterally and retroactively decide what portions of a contract may be enforced.

The Court therefore finds the arbitration clause unenforceable because it seeks to effect a prospective waiver of federal statutory rights.

### b. Unconscionability Under Nevada Law

Plaintiff separately contends that the Loan Agreement is procedurally and substantively unconscionable, preventing a finding that the parties agreed to arbitrate. The Court agrees.

### i. Procedural Unconscionability

Plaintiff contends that the Loan Agreement is procedurally unconscionable because it was not possible for him to "ascertain the dispute resolution processes and rules to which he was agreeing" when he signed the Loan Agreement which included the arbitration provisions. CashCall argues that the arbitration provisions were not hidden—rather, they were "set off by a separate heading in bold and all capitals" and there was a clause in close proximity to the signature line. (ECF No. 14 at 9–10). Additionally, CashCall contends that having an opt-out provision supports its position that the arbitration provisions are not procedurally unconscionable.

The Court agrees that the arbitration provisions were identified in the Loan Agreement. However, the standard for procedural unconscionability under Nevada law also requires examination of the effect of an arbitration clause (and related provisions) and whether an individual could readily ascertain the effect(s) of the arbitration clause. The Court finds that the effect of the arbitration clause—the elimination of a consumer's ability to vindicate his federal statutory rights and the inapplicability of federal constitutional protections for fairness—could not be readily ascertained by the Plaintiff. The Plaintiff could not have reasonably ascertained and agreed to arbitrate his disputes in a forum that does not offer the fundamental protections for fairness in a judicial or arbitral proceeding. See generally 🔖 Plains Commerce Bank, 554 U.S. 316 (2008) (explaining that "tribal sovereignty, it should be remembered, is a sovereignty outside the basic structure of the Constitution."). The Court finds that an average person would not be familiar with unique sovereignty of tribal law in relation to state and federal law. That is to say that the Court finds that an average person untrained in the law would not know that, by agreeing to tribal law as the choice of law, he or she was agreeing to completely abandon all possible federal and state statutory claims (such as those under the TCPA or NRS 604A) and also abandon any federal and state due process protections associated with the adjudication of such rights.

The opt-out clause in this case does not alleviate the unconscionability of this contract. Under the Agreement, even if a party opts out of the arbitration provisions, the Loan Agreement explicitly states that any disputes are nonetheless subject to the laws of the Cheyenne River Sioux Tribal Nation. Thus, the opt-out provision does not remedy the problem, because it does not offer a true opportunity to choose to retain the ability to pursue the federal and state statutory rights outside of the limitations of the sovereign law of

Case 2:20-cv-00647-APG-NJK Document 16-1 Filed 05/04/20 Page 41 of 42

**Rideout v. CashCall, Inc.; Not Reported in Fed. Supp. (2018)**

the Cheyenne River Sioux—where such statutory rights and procedural due process rights do not exist.

 **\*8** Again, CashCall's last minute effort to unilaterally "stipulate" that Plaintiff can continue to pursue his federal statutory claims in arbitration is unavailing. Even if Plaintiff selects an arbitrator from AAA or JAMS, and even if CashCall does not ask the arbitrator to apply Cheyenne Sioux Tribal Nation law, the plain language of the Loan Agreement requires the arbitrator to do so. The arbitration may be done in accordance with federal law and the procedures of the selected arbitration organization, <u>only</u> to the extent neither conflicts with Cheyenne River Sioux Tribal Nation law—which is to say, not at all. (<u>See</u> ECF No. 6–1 at 7) ("You also expressly agree that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement."); (see also ECF No 6–1 at 8) ("The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate ...."). The Court finds that this confusing sequence of conflicting phrases in the Agreement is meant to obscure to the consumer the fact that she or he is essentially waiving all of the protections and claims that might be available under federal law. Therefore, the Court finds that the arbitration provisions contained within the Loan Agreement "involve [ ] the use of ... complicated, incomplete or misleading language that fails to inform a reasonable person of the contractual language's consequences" and therefore are procedurally unconscionable. D.R. Horton, 96 P.3d at 1162–63.

### ii. Substantive Unconscionability

Plaintiff argues that the arbitration provisions are substantively unconscionable because its terms are one-sided and therefore unfair. Plaintiff further argues that there was unequal bargaining power with regard to the choice of law for the overall Loan Agreement, and with regard to the arbitration provisions.

CashCall contends that there is no substantive unconscionability for two reasons: 1) because the Loan Agreement provides for arbitration before AAA or JAMS using the rules of those organizations, and 2) because by the terms of the Loan Agreement, CashCall will pay the filing fee and any costs or fees charged by the arbitrator. Additionally, CashCall relies again upon the opt-out clause.

As a preliminary matter, the Court finds that, given the severe degree of procedural unconscionability of the Loan Agreement in terms of its conflicting clauses and reliance on obscure law, less evidence of substantive unconscionability is required. D.B. Horton, 96 P.3d at 1162.

Nonetheless, the Court finds that there is substantive unconscionability and that such would be the case even if there was not significant procedural unconscionability. First, the very nature of the type of loan and its repayment terms reflect the extreme imbalance of bargaining leverage. Plaintiff obtained a loan for \$2500 with a high interest rate, and paid over \$10,000 in interest and principal payments. Second, the imbalance between the parties is reflected in the fact that the terms of the contract were not subject to negotiation. CashCall has repeatedly reiterated that the contract was a standard agreement based upon a previous standard agreement which it had unilaterally modified over time. Third, the imbalance between the parties is reflected in the terms of the contract with respect to enforcement of its provisions. The Loan Agreement's apparent reliance on Cheyenne River Sioux law —which would, if enforced, provide the Defendant with significant relief from federal and state statutory causes of action and simultaneously strip the Plaintiff of both federal/ state statutory remedies and federal procedural protections —further confirms the imbalance of power between the two contracting parties. Therefore, the Court finds that the Loan Agreement and its arbitration provisions are substantively unconscionable.

Because the Loan Agreement is both procedurally and substantively unconscionable, the Court finds that there is no valid or enforceable agreement to arbitrate. Based on the analysis above, the Court does not find any compelling reason to dismiss this case. As no valid agreement to arbitrate exists, the Court cannot find that the disputes raised are subject to arbitration.

### VI. CONCLUSION
Accordingly, Defendant's Motion to Dismiss, or, in the Alternative, Motion to Stay and to Compel Arbitration (ECF No. 6) is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1220565

## Footnotes

1    The Loan Agreement states that the amount financed to Plaintiff was $2,525.00. (ECF No. 6–1 at 5).

2    The Third Circuit, since the filing of the parties' submissions, has also recently held this same arbitration clause to be unenforceable for offering an illusory arbitral forum. MacDonald v. CashCall, Inc., 2018 U.S. App. LEXIS 4795, 2018 WL 1056942 (3d Cir. Feb. 27, 2018). The Court finds that this would be a separate basis to invalidate the clause in this case for the same reasons noted in MacDonald. Id. at *11–18, but the Court does not reach this analysis since the Court will invalidate the arbitration provisions on other grounds.

3    The Fourth Circuit also noted: "while Western Sky was a tribal-owned entity, [defendant loan servicer] is not." This Court recognizes that CashCall also appears to not be a tribal-owned entity, and does not dispute this fact in any of its briefing. (See ECF No. 6–1 at 12) (listing CashCall's address for customer service inquiries and payment processing as located in Anaheim, CA).

---

End of Document                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.